In the Matter of the Application of the MAYOR, ALDERMEN AND COMMONALTY OF THE CITY OF NEW YORK to Acquire Title to Certain Lands for Public Parks, etc.

| 99 | 569 |
|----|-----|
| 108 | 386 |
| 99 | 569 |
| 119 | 210 |
| 99 | 569 |
| 128 | 362 |
| 129 | 332 |
| 99 | 569 |
| 139 | 432 |
| 99 | 569 |
| 144 | 409 |
| 99 | 569 |
| 152 | 264 |
| 99 | 569 |
| 160 | 241 |
| 99 | 569 |
| 168 ⁹ | 86 |
| 99 | 569 |
| 170 | ⁵109 |

The fact that the act entitled "An act laying out public places and parks in the twenty-third and twenty-fourth wards of the city of New York, and in the adjacent district of Westchester county, etc." (Chap.522, Laws of 1884), contains provisions authorizing the use of one of the parks for military purposes (§ 6), and extending the jurisdiction of the department of public parks of the city over the whole of the newly-acquired terri-

tory, does not render it obnoxious to the constitutional provision declaring that a local or private bill shall contain but one subject, which shall be expressed in the title (State Const., art. 3, § 16); said provisions are within the scope of the general subject so expressed.

Said act is not violative of the constitutional provision, declaring that no person shall be deprived of property without due process of law, and prohibiting the taking private property for public use without just compensation (State Const., art. 1, § 6); a sufficient provision is made for notice and hearing to constitute due process of law, and the act provides a certain definite and adequate source and manner of payment, as the municipality is absolutely required to pay, within four months after the confirmation of the commissioners' report, the compensation awarded to parties interested (§ 6), and, in case of default, is made liable after demand to an action at the suit of any such party; the act also provides for and protects the rights of all parties interested.

The fact that the act specifies the first judicial district as the one wherein proceedings under it are to be instituted does not bring it in conflict with the constitutional prohibition (Art. 3, § 18) against the passage of a local or private bill, "providing for changes of venue in civil or criminal cases;" the venue of such a proceeding falls within the legislative discretion.

The act is not in hostility to the provision of the Constitution that whenever private property is taken for public use, the compensation, when "not made by the State, shall be ascertained by a jury, or by not less than three commissioners" (Art. 1, § 7); three commissioners are required, and two are authorized to act only where the other, having opportunity, declines to take part, or is unable to be present, or differs from his associates, and the giving a majority a right to act under such circumstances meets the constitutional requirement.

The provision of the act extending the jurisdiction of the department of public parks, over that portion of the land authorized to be acquired under it, outside of the city and in Westchester county limits, is not violative of that provision of the Constitution which preserves to counties, cities, towns, etc., the right to elect their own local officers (Art. 10, § 2); the park police do not become Westchester county officers, and no officers of that county are legislated out of office.

*It seems* that if this was a tenable objection, the effect would be simply to annul an unessential detail of the act without interfering with the residue.

Proceedings were instituted by the city under said act.    It was objected, by parties interested, to the order appointing commissioners, that the legislature had no power to compel a municipality to incur a debt against its will for purposes such as are contemplated by the act. *Held,* that the question was not in the case, as the city appeared, not objecting, but assenting.

Also *held,* the fact that under the act the city was authorized to incur a debt

for the purchase of lands outside of the boundaries of the city did not bring it within the provision of the Constitution prohibiting a city from incurring a debt except for city purposes ; such a purpose is not limited to a work or expenditure within the city.

To constitute a city purpose within the meaning of the constitutional prohibition, the purpose must be primarily for the benefit, use or convenience of the city, as distinguished from that of the country outside, although the latter may be incidentally benefited, and the work must be of such a character as to show the predominance of that purpose, and must be within the ordinary range of municipal action.

The acquiring and maintaining public parks is within that range, and the acquiring thereof so near to the city, although beyond its boundaries, as to be convenient and accessible, and likely to be overtaken and surrounded by the city's growth, satisfies the first condition.

*It seems* that to authorize the reversal by the courts of the legislative decision manifested by the passage of an act as to what is a city purpose, the case must be a clear one, conclusively showing an underlying purpose different from the city's use or convenience.

(Argued June 3, 1885 ; decided October 6, 1885.)

APPEAL from order of the General Term of the Supreme Court in the first judicial department, made the fourth Monday of October, 1884, which appointed commissioners to appraise lands sought to be taken for public parks under the act chapter 522, Laws of 1884. (Reported below, 34 Hun, 441.)

*Simon Sterne* for appellants.   Chapter 522 of the Laws of 1884 is unconstitutional and void, being in contravention of article 8, section 2, of the Constitution, which provides that "no county, city, town or village shall be allowed to incur any indebtedness except for county, city, town or village purposes." (*People, ex rel.* v. *Kelly,* 76 N. Y. 475 ; *People, ex rel.* v. *Albertson,* 55 id. 50 ; *Matter of Deansville Cem. Asso.,* 66 id. 572 ; *Talbot* v. *Hudson,* 16 Gray, 417, 421 ; 71 Ill. 333 ; *People, ex rel.* v. *Batcheler,* 53 N. Y. 128 ; *Washington Ave. Case,* 19 P. F. Smith [69 Penn. St.] 352, 358 ; *People* v. *Common Council,* 28 Mich. 228 ; *People* v. *Hurlburt,* 24 id. 44 ; Cooley on Taxation, 487, 488, 493 ; *Thomas* v. *Leland,* 24 Wend. 66 ; *State* v. *Haben,* 22 Wis. 660 ; *Hasbrouck* v. *Milwaukee,* 13 id. 37 ; *Mills* v. *Charlton,* 29 id. 413 ; *Knapp*

v. *Grant*, 27 id. 143 ; *State* v. *Tappen*, 29 id. 664 ; *In the Matter of Flatbush*, 60 N. Y. 398 ; *Missouri* v. *Leffingwell*, 54 Mo. 458 ; *County Court* v. *Griswold*, 58 id. 175 ; Dillon on Municipal Corporations [3d ed.], 599 ; *Gardner* v. *Newburg*, 2 Johns. Ch. 166 ; *Higginson* v. *Nahand*, 11 Allen, 530 ; *Blodgett* v. *Boston*, 8 id. 237.)   Under the same provision of the Constitution, the act is unconstitutional as compelling New York to pay for an improvement for the benefit of Westchester county.   (*In re Lands in Flatbush*, 60 N. Y. 398.)   The act in question is unconstitutional, because it involves the attempt on the part of the legislature to compel the city against its will to incur a debt by the issue of its bonds for an alleged local improvement not essential, and if of any utility, of general, and not local utility. (*People, ex rel.* v. *Mayor, etc.*, 51 Ill. 17 ; 58 id. 456 ; 74 id. 47, 50 ; *State* v. *Leffingwell*, 54 Mo. 458 ; *People* v. *Batcheller.* 53 N. Y. 128 ; Girard's Title to Real Estate [2d ed.], 32 ; *People, ex rel.* v. *Common Council of Detroit*, 28 Mich. 228 ; *Baily* v. *Mayor, etc.*, 3 Hill, 531.)   Said act is violative of the provisions of section 2, article 10, of the Constitution, as it seeks to establish both directly and by necessary implication a new civil division of the State, enlarging the boundaries of New York city for some purposes, while leaving them unchanged as to others, and ex-territorially extending the jurisdiction of appointed officers of New York city, to-wit: The park commissioners into Westchester county, for which they were not appointed, and correspondingly diminishing the authority of properly elected or appointed officers in Westchester county, over the district embraced within this so-called park area.   (*People, ex rel.* v. *Albertson*, 55 N. Y. 50 ; *People* v. *Porter*, 90 id. 68 ; *People* v. *Keeler*, 29 Hun, 175.)   The act is repugnant in letter and spirit to the sixth and seventh sections of the first article of the Constitution of the State of New York, as to the taking of private property and compensation therefor, and of section 18 of third article of the Constitution providing that no private or local bill shall be passed, providing for changes of venue. (*Cragin* v. *Lovell*, 88 N. Y. 258 ; *Gould* v. *Bennett*, 59 id. 224 ; *Stuart* v. *Palmer*,

74 id. 183; *People, ex rel.* v. *Nichols*, 79 id. 588.) The act is in conflict with section 6, article 1, of the Constitution, which provides that private property shall not be taken for public use without just compensation. (10 La. Ann. 150; 16 Cal. 153.) The act is obnoxious to section 7, article 1, of the Constitution, which provides that the damages for property taken, shall be ascertained by a jury or by not less than three commissioners. (*Matter of N. S. Ry. Co.*, 5 Ch. App. 671; *Railway and Canal Cases*, 691; *Attorney-General* v. *Rathmines*, 5 Irish L. R. 114; *Steele* v. *N. M. R. R. Co.*, 16 L. T. [N. S.] 192; 36 L. J. Ch. 540; *Bill* v. *Sierra Nevada Lake Water and Mining Co.*, 1 DeG., F. & J. 177.) If property be taken by the sovereign without public necessity, as there is no public right, it is unlawfully taken, although full and adequate compensation be made. (Parsons' Rights of a Citizen of the U. S. 251.) Reasonable and proper notice is a condition precedent to the exercise of the right of eminent domain and taxation. (*Burns* v. *Multnomah R. R. Co.*, 15 Fed. Rep. 183; *Railroad Tax Case*, 13 id. 750; *Philadelphia* v. *Miller*, 49 Penn. St. 440; *Darling* v. *Gunn*, 50 Ill. 424; *Cleghorn* v. *Postlewait*, 43 id. 428; *State* v. *Drake*, 33 N. J. 194; *Butler* v. *Supervisors*, 26 Mich. 22.) Acts in derogation of the rights of private property, and which involve the exercise of the power of taking private property against the owner's consent, are to be strictly construed under the authority of *Water Commissioners of Amsterdam* (96 N. Y. 357).

*John C. Shaw* for appellant, Mary G. Pinkney. Chapter 522, Laws of 1884, is in violation of section 16, article 3 of the Constitution, which provides as follows: "No private or local bill which may be passed by the legislature shall embrace more than one subject, and that shall be expressed in its title." (*Matter of Lands in Flatbush*, 60 N. Y. 398; *Matter of Paul*, 94 id. 497; *In re Sackett Street*, 74 id. 103; *People* v. *Brooklyn*, 13 Abb. [N. S.] 121; *Matter of Roberts*, 84 N. Y. 618.) It violates section 2 of article 10 of the Constitution, because under it a department of the city government of New York,

organized under its charter, is clothed with jurisdiction over lands situated in Westchester county. (*People* v. *Albertson*, 55 N. Y. 50 ; *People* v. *Keeler*, 29 Hun, 175.) It violates section 17, article 3 of the Constitution, which provides as follows : "No act shall be passed which shall provide that any existing law, or any part thereof, shall be made or deemed a part of said act, or which shall enact that any existing law, or part thereof, shall be applicable except by inserting it in such act." (*Wells* v. *City of Buffalo*, 14 Hun, 438.) The act is unconstitutional because it expressly makes it competent and lawful for any two of the commissioners to perform the trusts and duties of the commissioners, and it provides that the action of two shall be just as valid and effectual as the acts of all would have been "if they had acted therein." (*Board of Water Comrs.* v. *Lansing*, 45 N. Y. 19.) The act violates section 6, article 1 of the Constitution, which provides as follows : "No person shall be deprived of life, liberty or property without due process of law." (*Stewart* v. *Palmer*, 74 N. Y. 183 ; *Matter of Boston Road*, 27 Hun, 409 ; *Matter of William and Anthony Streets*, 19 Wend. 694 ; *Matter of Comrs. of Central Park*, 51 Barb. 277 ; *In re Fourth Avenue*, 3 Wend. 452 ; *In re Thirty-ninth Street*, 1 Hun, 191 ; *In re John and Cherry Streets*, 19 Wend. 658 ; *In re One Hundred and Thirty-eighth Street*, 60 How. 290.) The act violates section 20 of article 3 of the Constitution, which provides as follows : "Every law which imposes, continues or revives a tax shall distinctly state the tax and the object to which it is to be applied, and it shall not be sufficient to refer to any other law to fix such a tax or object." (*Sun M. Ins. Co.* v. *New York*, 5 Sandf. 10 ; *People* v. *Supervisors*, 52 N. Y. 556.) The legislature cannot condemn, under any circumstances, property already devoted to a public use. (*Matter of B. & A. R. R. Co.*, 53 N. Y. 574 ; *Matter of Buffalo*, 68 id. 167.) Miss Pinkney, one of the appellants, has a right, as a property-owner, to oppose this application and prevent the initiation of a proceeding which may increase her taxes to a very large extent. (Code Civ. Pro., § 1925 ; *Ayers* v. *Lawrence*, 59 N. Y. 192 ; *Kilbourne* v. *St. John*, 59 id. 21.)

*John F. Dillon* for respondent.   These parks are for public
use, as declared in the act, and they would not·be subject to
taxation by the authorities of Westchester county without the
express consent of the legislature.   (Dill. on Mun. Corp. [3d
ed.].)   Indebtedness for new parks is an indebtedness in-
curred for·" city purposes" within the meaning of the Consti-
tution (§ 2, art. 8.)   (*People* v. *Kelly*, 76 N. Y. 488.)   The
taking for a public park is a taking for public use.   (*Owners,
etc.,* v. *Albany*, 15 Wend. 374; *Holt* v. *City of Summerville*,
127 Mass. 408; Dill. on Mun. Corp. [3d ed.], § 598.)   For an
undeniable public purpose, such as the acquisition of lands for
highways, streets and parks, the legislature may enact man-
datory statutes and direct any municipal agency to execute
and carry out the legislative command and to meet the nec-
essary expense either by immediate taxation or by the creation
of a debt to be paid by taxation or from sources of revenue or
both.   (Laws of 1857, 721; Laws of 1858, 452; Laws of 1861,
663; Laws of 1867, chap. 880; Laws of 1883, chap. 490; id.
189, § 1; id., chap. 170; Laws of 1877, 305, chap. 278; Laws
of 1883, 687, chap. 494; Laws of 1883, 218, chap. 211;
*Thomas* v. *Leland*, 24 Wend. 65; *Philadelphia* v. *Field*, 58
Penn. St. 320; *Guildui* v. *Otsego*, 20 Minn. 74; *U. S.* v. *B. &
O. R. R. Co.*, 17 Wall. 322; *Guilford* v. *Supervisors*, 13 N.
Y. 143 ; *Blanding* v. *Burr*, 13 Cal. 343 ; *U. S.* v. *B. & O.
R. R. Co.*, 17 Wall. 322; *New Orleans* v. *Clark*, 95 U. S.
654; *Carter* v. *Bridge Props.*, 104 Mass. 236; *North Mo.
R. R. Co.* v. *Maguire*, 49 Mo. 490 ; *People* v. *Flagg*, 46 N.
Y. 401; *Weismer* v. *Village of Douglas*, 64 id. 91; *Brewster*
v. *Syracuse*, 19 id. 116 ; *People* v. *Dayton*, 55 id. 367 ; *People*
v. *Brooklyn*, 4 Comst. 419 ; *People* v. *Kelly*, 76 N. Y. 475 ;
*In re Woolsey*, 95 id. 135 ; *Astor* v. *Mayor, etc.*, 62 id. 567.)
The act of 1884 provides for "just compensation " to the
property-owners.   (*In re Petition of the United States*, 96
N. Y. 233, 237.)  ·If the Legislature has power to authorize
the general design of an act, it will not be invalidated, because
of error in matter of detail.   (*Gordon* v. *Comes*, 47 N. Y.
617.)   The whole will be condemned only "when it is impos-

sible to suppose the legislature would have passed the one portion without the other." (*People* v. *Kenny*, 96 N. Y. 294, 302; *In re Middletown*, 82 id. 196, 202; *People* v. *Briggs*, 50 id. 566.)

Finch, J. Numerous provisions of the Constitution are claimed to have been violated by the enactment of the law authorizing and requiring the acquisition and maintenance of new public parks by the city of New York. The large interests involved, and the importance of some of the questions raised, have subjected the act to a patient and critical examination, both in the court below and upon the argument at our bar; and seem to demand from us a full statement of the reasons upon which our determination is founded.

1. The title of the act is "An act laying out public places, and parks, and parkways, in the twenty-third and twenty-fourth wards of the city of New York, and in the adjacent district in Westchester county, and authorizing the taking of lands for the same," (Laws of 1884, chap. 522); and is claimed to violate section 16 of article 3 of the Constitution, requiring that a private or local bill shall embrace but one subject, which shall be expressed in the title. Section 6 of the Park Act authorizes the use of a portion of Van Cortlandt park for the purposes of a rifle range, and military parade ground; and section 12 extends over the whole of the newly-acquired territory, the jurisdiction of the department of public parks, which, by the city charter of 1873, was made the dominant authority for their maintenance and protection. It is insisted that two new and separate subjects were thus injected into the body of the act, without hint or reference in the title. The criticism is quite too rigid and narrow. It would lead us to a condemnation which few titles would escape until they became cumbersome and awkward digests of the details of their enactments. What are here denominated new subjects are fairly and reasonably elements and details of the laying out of new parks, and the acquisition of lands therefor, and so embraced in the one general subject of the bill. The most

valuable test of such a title, and the one which we have usually employed, is the inquiry whether the title was so framed as to be deceptive or misleading, and consummated the evil at which the constitutional prohibition was aimed. (*Matter of Lands in Flatbush*, 60 N. Y. 398; *Matter of Paul*, 94 id. 497.) Where one, reading a proposed bill with the title in his mind, comes upon provisions which take him by surprise, which he could not reasonably have anticipated, and so both citizen and legislator are misled and thrown off their guard, it is our duty to declare the condemnation of the fundamental law. But where, as in the present case, no such evil lurks in the title, and the provisions criticised may be easily and reasonably grouped within the scope and range of the general subject expressed, we ought not to destroy the legislation assailed upon some nice and rigid criticism of forms of expression. How the parks should be used and governed is a natural detail of their laying out and acquisition, and not the introduction of a new and foreign subject.

2. It is further objected to the act, that it makes no provision for just compensation to those whose lands are taken, and so violates section 6 of article 1 of the Constitution. While it is not necessary, in advance of the taking, to pay to the landowner his compensation, it is necessary that the act which invades his ownership shall provide for a certain and definite and adequate source and manner of payment. (*Sage* v. *City of Brooklyn*, 89 N. Y. 189.) This necessity is vital and of the most essential character, since if unheeded or disregarded, it transforms the right of eminent domain into a legalized plunder of the citizen. But this act does not so offend. It puts the public purse of the city behind the debt as the source of its payment. By section 4 the municipality is required within four calendar months after the confirmation of the report of the commissioners, to pay the compensation awarded to the parties interested, and if payment be not so made, those to whom it is due may, after demand, maintain an action against the city. Nothing in this record shows that the muni-

cipality has already reached the limits of its capacity to contract debt, or cannot legally incur the new liability.   There is no ambiguity or uncertainty about this provision, and the citizen is not turned over to the blind remedy of uncertain and complicated assessments, and a devious and doubtful litigation.   It is true that the act contains provisions to enable the city to meet the liability imposed, which have been the subject of criticism in the arguments addressed to us.   By section 10 the city is authorized to issue thirty-year bonds, drawing interest at a rate not exceeding three per cent, to be sold at not less than par, and the proceeds of which shall constitute the "New Park Fund."   That does not alter or affect the right of the land-owner.   He has still the responsibility of the city which he may enforce in the courts, and has no concern with the question of the source of the debtor's payment.   We cannot say that the provision is inadequate even for the purposes of the municipality, but whether so or not, the security of the creditor remains in the corporate liability, which we have always held sufficient.

Further objection upon this branch of the case respects the language used in the act directing the payment of the awards. By section 5 the commissioners are required to set forth in their report among other things "the several and respective sums estimated as and for the compensation and recompense, or allowance to be made for the loss and damage of the respective owners of the fee or inheritance of such lands, tenements, hereditaments and premises respectively, and the loss and damage of the respective owners of the leasehold estate or their interests therein separately."   It is said that this language excludes from compensation mortgagees, judgment creditors, widows whose dower has been admeasured, and the like.   This is an entire misconception of the meaning of the act.   The general provision for awards is contained in a previous section, (§ 2), and is as broad as language can well make it.   Specifically it requires the commissioners to estimate and report "the loss and damage to the respective owners, lessees, parties and persons respectively entitled to or interested in the said lands,

tenements, hereditaments and premises." Section 3 provides for the filing and correction of their report, and section 4 for the payment of the awards. Then comes section 5, which contains the language criticised. It relates to specific and exceptional cases, and gives specific directions. Where any of the owners or persons interested are minors; where the names of such owners or persons interested are not set forth in the report; where they are unknown and cannot be ascertained; the award may be paid into court; but, lest that permission should be abused or too loosely construed, the section provides that the names shall be given, so far as they can be ascertained, of all persons interested, and a sufficient designation of the lands, and then that the commissioners shall report separately the damages to the fee and any leasehold estate. The whole point of the provision is that, in a case where all the interested parties are not known and their separate rights cannot be ascertained, the estimate shall not be made in the gross if there is both a fee and a leasehold estate, but the damages to each shall be separately estimated and stated. A study of the terms of the act thus dispels the least shadow of reason for the contention that the rights of some interested persons have been disregarded.

3. It is further argued that the act violates section 7 of article 1 of the Constitution, in that it commits the estimate and appraisal of damages to two commissioners instead of three. This objection again is founded upon a misconstruction of the act by taking a phrase from its surroundings, and reading it with literal severity. Section 2 provides for the appointment by the Supreme Court of three disinterested persons as commissioners to estimate damages, who are to take the oath of office and then proceed with due diligence to make a just and equitable estimate. Section 8 then provides for action by a majority of the board, when only such majority are acting or agreed. It may be conceded that the provision might have been more accurately expressed, but about its meaning and proper construction there can be no just doubt. The phrase relating to all the commissioners, " if they had

acted therein;" and that relating to such two "as shall be acting in the premises," indicate that the provision refers to a case where one of the three, having opportunity to act, declines to do so, or is unable to be present, or differs from his associates; and was not meant and cannot be held to give to two the right to exclude the voice or vote of the third. If under this act two of the commissioners, without notice to the third, and ignoring his right, should assume to make an appraisal, we should easily hold it to have been unauthorized by the statute. For the provision of section 2 which requires the three commissioners to make the appraisal with due diligence and to ascertain the damages must be read in connection with section 8, and it could not be said that the commissioners made the appraisal when one of them was excluded ; but it could be and would be true, as in all cases of action by a majority, where the third had notice and opportunity to participate, but omitted or was unable to do so. In case of death, resignation, disqualification or refusal to act, the law provides for a substituted commissioner (§ 7), so that the province of section 8 is narrowed to the case of a disagreement, or a temporary or incidental absence. In these provisions we discover no purpose to evade or violate the fundamental law, and deem it our duty to adopt a natural construction in consonance with what beyond any doubt was the legislative intention.

4. But it is further contended that the act deprives the citizen of his property without "due process of law," for the reason that no sufficient notice or opportunity to be heard is given by statute. The objection specifies three grounds of complaint: that no notice to the land-owner is required before the filing of the report; that no provision is made for the taking of evidence; and that the motion for confirmation is required to be made at the General Term of the first department. The details of the act sufficiently provide for notice and a hearing to obviate the constitutional objection. The statute itself condemns and appropriates for the public use the precise lands selected, by metes and bounds, so that every owner affected had means of knowing that his land was taken. The

city authorities are then required to make application to the General Term, giving twenty days' notice by publication in the papers in which the city ordinances are required to be published. The commissioners, after making their report, are commanded to file it in the office of the commissioner of public works in the city of New York, at least fourteen days before its presentation to the court, for the inspection of whom it may concern, and give notice for ten days by a daily advertisement in the papers above described of such deposit, and of the date at which the motion for confirmation will be made; and within such ten days any person interested may file his objections to the appraisal with the commissioners, who shall thereupon "reconsider their said estimate," and correct it in the light of the objections if they shall deem it needful or just. Upon the application of the city authorities or the commissioners, the motion for confirmation comes before the court, which, "after hearing any matter which may be alleged against" such report, may confirm the same, or send it back for revision or correction, or appoint new commissioners to make a new appraisal. There is thus secured to the landowner notice of the proceeding against him and a double opportunity to be heard. Notice by publication we have many times held to be sufficient, and that the legislature may prescribe the manner and time. That the publication is required to be made in certain of the city papers, although lands affected are in Westchester county, is immaterial to the constitutional question. Such publication cannot be deemed unreasonable, evasive or fraudulent, but is a fair exercise of the legislative discretion. The lands taken outside of the city limits adjoin its eastern boundary, where the proposed Bronx park crosses that boundary and enters the county of Westchester; while the Pelham Bay park, in the latter county, is within about three miles of the city's nearest line, and about twelve miles from what may be deemed the center of the city. The legislature might well consider the city papers as sure avenues of notice as those printed in Westchester county, and no constitutional provision bars the exercise of that discretion. That the

hearing allowed before the commissioners follows their esti-
mate of damage is equally an immaterial suggestion.    The
same thing is true of assessors in fixing their basis of taxation.
In each case the first judgment is tentative and not final, and
enables the parties interested to know, before incurring any
expense or trouble of a hearing, whether such is needed or de-
sirable.    But upon this hearing and upon the motion for con-
firmation, it is said no evidence can be taken, and not even
affidavits may be used, and that the General Term were in
error in asserting the contrary under the analogy drawn from
the Street Opening Acts of 1813.    One of the learned counsel
for the appellants avers that the act of 1813 was amended in
1839 and again in 1865, and that, of the cases cited under
them, some did not present the question, and one held the
exact contrary.    (*In the Matter of John and Cherry Streets*, 19
Wend. 659.)    That case was decided in May, 1839, and it is
the counsel and not the court with whom lies the mistake as
to its meaning.    It expressly determines that the land-owner
may present affidavits to the commissioners, and even such as
consist mainly of opinions as to value, and that the court, on
presentation of the report, will simply refuse to hear new affi-
davits then made for the first time and never presented to the
commissioners.    The counsel added that the court will not
review the judgment of the commissioners upon the facts.
That is true with the important exception of cases in which a
gross inequality of values is developed, or the appraisal is made
upon a wrong principle.    But we hardly need to argue that
rules which assimilate the action of the confirming court to
that of an appellate tribunal, and so conform to the ordinary
process of law, do not make a case of want of due process of
law.    Modes of procedure and forms of remedy are within the
legislative discretion.    The fundamental law only requires
that in some manner the citizen shall have notice and be heard
before his property is taken, and that right this act preserves
by a legal procedure long in use and often recognized by the
courts.    The venue of such proceeding falls, of course, within
the legislative discretion.    The lands selected were partly in

the first judicial department, and partly in the second. Either might properly be chosen as the tribunal of confirmation, and no constitutional provision compelled the one proceeding to be split into two, and be heard in fragments before different General Terms.

5. Some criticism has been aimed at the provision of the act which extends the jurisdiction of the city department of parks over the newly-acquired territory. By the terms of the New York charter, that department has charge of the protection and maintenance of the city parks, and is authorized to appoint policemen for the preservation of peace and order who, within the parks, are vested with the same power and authority as the police of the city. For a breach of the peace or an offense committed in Pelham Bay park, and within the county of Westchester, the arresting officer might be required to take his prisoner before a magistrate of the adjoining county. This provision of the act, it is said, violates section 2 of article 10 of the Constitution, which preserves to counties, cities, towns and villages the right to elect their own local officers, or to have them appointed by some designated local authority. If that were true it would merely annul an unessential detail of the act; but we do not see how the section is infringed. The park police do not become Westchester county officers. No official of that county is legislated out of office, and successors appointed by State authority, as was the case upon an insufficient pretext in *People* v. *Albertson* (55 N. Y. 50); nor are the powers and duties of any officer in Westchester, so curtailed or destroyed as practically to subvert his office and bestow it on another, as was the case of the sheriff of Albany county in *People* v. *Keeler* (29 Hun, 175). The appellants concede, using the language of their brief, " that there are no words in this remarkable act which take away from the county authorities of Westchester any of their jurisdiction or powers." And so no officers are removed or superseded or interfered with, and the local government of Westchester is not abridged. We can see that questions may arise as between the park police and the county authorities, and there may be a collision as to the rights of each,

but that will not raise the constitutional question presented. The park police will be and remain New York officers, and if there is no power to grant them authority within the lines of the city's property, at least that provision may give way to the right and duty of Westchester to preserve the peace and protect life and property within the county limits without any harm to the general scheme and scope of the law authorizing the new parks.

6. A final question presented is more serious than those already considered, and comes to us in a double form.   It is first said that the legislature has no power to compel a municipality to incur a debt against its will for purposes like those which the act aims to accomplish ; and then that the purchase of land for public parks outside of the corporate boundaries is not a "city purpose," and so the creation of a debt for such purchase is forbidden by the Constitution.

The first of these questions is not here.   The city stands before us not objecting, but assenting.   Through its proper representatives it came to the court asking for the appointment of commissioners, and saying that it desired to avail itself of the provisions of the act; and is here by the corporation counsel and his associates defending the enactment.   Back of the act itself lay the appointment of a commission to consider the subject and select the lands. (Laws of 1883, chap. 253.)   That act was not mandatory.   The mayor and aldermen made the appointment of their own free will and volition, and without command.   While we observe that the learned counsel for the appellants signs his brief as representing the city officials, we must disregard the intimation.    The city cannot be at the same time on opposite sides of the same question.   We must go by the record, and that shows that no debt is being imposed on the city against its will; and whatever there may be of that question is not in the case.

The remaining inquiry gave a wide range to the argument, and put before us many considerations pertinent to the prudence and wisdom and justice of the enterprise, but which, so far as we are able, we must dismiss from our thought.   The

question of propriety was for the legislature. Nothing is here but the question of power. If it existed, we must so declare. The responsibility for its exercise is not ours. It appears to be conceded, and has not been denied, that the acquisition and maintenance of public parks, securing pure air and healthful rest and recreation to the people, is a "city purpose," when executed within the corporate limits ; and the sole contention is that it ceases to be a "city purpose" when in any degree or to any extent it moves outside of those boundaries. What is the change which transforms the inherent nature and character of a "city purpose," when it passes the municipal lines, we are told only by a grouping of extreme consequences foretold as possible results. If the city may go three miles from its nearest boundary, and with the connecting ribbon of a "parkway," take Pelham bay and Hunter's island, why, it is asked, may it not take the Falls of Niagara, or a mountain of the Adirondacks, or land in Dutchess county, and building a road thither, claim it to be a "city purpose"? The question is a fair one, and demands a satisfactory answer.

But before discussing the subject on its merits, it is best to secure the guidance and instruction of such precedents as exist, for the question will be found, I think, to be scarcely an open one. No one controverts that it was a proper city purpose for the metropolis to spend numerous millions outside of its corporate limits in the purchase, forty miles away, of water rights and land for dams and reservoirs to supply the citizens with water. It is true that the purpose contemplated was to bring the pure water to the citizens, while here it contemplates leading the citizens to the pure air. Granted that the necessities are not equal, and the modes of supply differ, and yet that test of a city purpose, which asks if the property bought and the money spent go outside of the corporate boundaries must be abandoned. It will not serve for a rule. The question was fully argued and frankly decided in the Brooklyn bridge case. (*People, ex rel. Murphy, v. Kelly,* 76 N. Y. 475.) That enterprise was first undertaken by a private corporation, the two cities being stockholders ; New York to

the amount of $1,000,000, and Brooklyn of $2,000,000. During the process of construction, the Constitution was amended by what is now section 11 of article 8, and which, forbidding a debt for any thing but a city purpose, also forbade the ownership of stock in a private corporation. The legislature met the difficulty by providing for a dissolution of the corporation, and making the work an improvement of the two cities, to be completed at their joint expense; Brooklyn, however, to pay two-thirds of the same, and the whole expense not to exceed $8,000,000. A refusal to issue the bonds and advance the necessary means, when it became apparent that the cost would overrun the statute limits, brought the case into the courts. It was plain that the money of each city was being expended beyond its own boundaries, and upon a structure which, as to each, stood in part outside of its corporate lines; and equally plain that the bridge was not an imperative necessity, but only a great and useful convenience. It was contended in this court that it did not constitute a city purpose; and the precise question was whether it did or not by reason of each city's expenditure and construction beyond its own bounds. We decided that question; and here repeat the language used both because of its authority and because of the attack now made upon its doctrine. EARL, J., writing the prevailing opinion, declared: "Nor can it be said that the indebtedness authorized to be incurred by the cities for the construction of the bridge was not for a city purpose.   *   *   *
It would not be a city purpose for the city of New York to build a railroad from that city to Philadelphia, or to improve the navigation of the Hudson river generally between that city and Albany, although incidental benefits might flow to the city. Such works have never been regarded as within the legitimate scope of municipal government. On the contrary, it would be a city purpose to purchase a supply of water outside of the city and convey it into the city, and for such purpose a city debt could be created. So lands for a park could be purchased outside of the city limits, and yet conveniently near thereto.   *   *   *   It cannot, therefore, well be held, as

claimed by the learned counsel for the appellants, that what is meant by a city purpose is some work or expenditure within the city limits.    There could be no good reason for such a limitation.    It could be no worse for a city to incur debt for a city purpose outside of the city limits than for one within such limits, and there is just as much reason for allowing it to be incurred in the one case as in the other.    *    *    *    It would have been a city purpose if either city had been authorized to build the whole of the bridge, and it is none the less so that both are to unite in building it."    Such is the doctrine which this court has declared.    We are now asked to repudiate it as hastily and carelessly uttered.    With how little of justice that can be said of the language we have quoted may be made apparent by the record of the case itself.    The question was involved in the controversy.    It was raised and discussed by counsel quite sure to omit no pertinent suggestion.    In the opinion just quoted, Judges RAPALLO, ANDREWS and DAN-FORTH concurred.    Chief Judge CHURCH and Judges FOLGER and MILLER dissented.    The dissenting opinion was written by Judge FOLGER.    It bears the marks of the characteristic modesty with which he differed from his associates, and of his conscientious industry in searching for the truth ; and yet there is no word in it of dissent from the doctrine we have quoted, but the whole opinion is put upon the force of the limitation as to cost.    It is safe, therefore, to infer that the court were unanimous as to the doctrine under consideration, although the case was thoroughly sifted by a formidable dissent.    Beyond that, we shall hope in the end to vindicate the doctrine so earnestly assailed upon the present appeal outside of authority and on its intrinsic merits.

The legislation out of which grew the Prospect park of the city of Brooklyn came before this court. (*Matter of Lands in the Town of Flatbush*, 60 N. Y. 398.)    The original act constituted the park out of lands in the city and adjoining lands in the town of Flatbush, and lands in the town of New Lots for the special use of a parade ground (Laws of 1859, chap. 466) ; and afterward additional land was taken in the

town of Flatbush. (Laws of 1866, chap. 853 ) Authority to contract debt for the payment and make temporary loans was also given. (Laws of 1868, chap. 493.) The question raised in this court was over the right to assess lands in Flatbush adjoining the park for benefits, and it was held that the improvement was so entirely in the interest of the city that adjoining lands in the neighboring town could not be assessed for the cost. There is a feature in the Brooklyn acts which, to some extent, distinguishes them from the act before us. The lands acquired were annexed to the city of Brooklyn, and its entire municipal jurisdiction was thrown over the newly acquired territory. But the case after all was not one of a mere extension of the city's area. It was not essential to such extension that any land should be purchased, and the real city purpose was the taking for a park and not with a view of enlarging the city boundaries. The latter measure was but a governmental step deemed best for the control of the lands purchased for a park. In the Brooklyn case the annexation consisted in throwing over the Flatbush lands the complete jurisdiction of the city. In the New York case the annexation is incomplete and *pro tanto*, since only the authority of the city department of parks is extended to the outlying lands. But at least this instance suggests the inquiry whether there has not been still other legislation indicating what had long been deemed city or village purposes and so putting construction upon that phrase as used in the Constitution.

The statutes relating to rural cemeteries furnish such indication. In 1847 villages were authorized to purchase and hold lands for purposes of burial, but some of the language used indicated an intent to confine them within the corporate limits. But in 1869 (Chap. 727) cities and villages were authorized to acquire such lands adjoining their existing cemeteries, and all other restrictive language was carefully omitted; and then in 1870 (Chap. 760) the permission was made general without even the restraint of adding to an existing cemetery, and authority was given to borrow money for the purpose. Is it true that it is not a city or village purpose to go outside of the cor-

porate lines to buy and adorn in the quiet of the country a place for the burial of the dead? Or, must health and propriety be violated by interments within city bounds unless private corporations come to the rescue? It seems not to have been so understood. In 1847 (Chap. 141) the village of Norwich was authorized to receive and hold title to land not more than one mile from its boundaries, and to purchase additional adjoining lands. In 1862 (Chap. 71) the village of Dunkirk was empowered to locate a cemetery within or without its corporate limits, but within the town. And in 1858 (Chap. 72) the then village of Elmira was authorized to buy fifty acres of land for burial purposes within or near its municipal boundaries and to borrow $10,000 for payment of the cost. For the preservation of the public health a city or village may certainly purchase land beyond its boundaries for a hospital or pest-house, and so remove the danger of infection. Cities and villages planted upon navigable streams may have granted to them ferry rights, and own and control them. We have just held that the city of Hudson has a ferry right to Athens, and the village of Athens a ferry right to Hudson. Are we to say that it is not a city purpose of the one, nor a village purpose of the other, to buy and own land for slips or landings or ferry-houses on the opposite shore because beyond their own boundaries and in another town or county? It is true of all these cases that either wholly or partly the land purchased can only be used by going out of the city or village and not by bringing any thing in as in the case of the Croton water. The dead and the sick must be carried out and friends and attendants must follow, but does that make a constitutional difference? The truth is that neither in authority, nor in the legislative practice, nor in the common sense of the question is there any basis for declaring that there can be no true and sound municipal purpose which reaches beyond the corporate lines; and we are sure that the enterprise under consideration does not fall under a constitutional ban because it is in part to be executed outside of the city limits.

And yet that is not the end of the question, and the inquiry

as to a park at Niagara or in the Adirondacks remains unanswered. Beyond question, neither would be a city purpose, and when we have determined why, we shall have approached as near to what is the true test as the nature of the subject will permit. While, as was said in one of the cases cited, it is impossible to formulate a perfect definition of what is meant by a city purpose, yet two characteristics it must have. The purpose must be primarily the benefit, use or convenience of the city as distinguished from that of the public outside of it, although they may be incidentally benefited, and the work be of such a character as to show plainly the predominance of that purpose. And then the thing to be done must be within the ordinary range of municipal action. Acquiring and maintaining parks is within that range. Acquiring them so near to the city as to make them convenient and accessible and likely to be overtaken and surrounded by the city's growth, satisfies the first condition, while a park in the Adirondacks or at Niagara would not satisfy it at all, but would clearly indicate and conclusively prove an underlying purpose different from the city's use and convenience, and of which that use and convenience was but a pretext and cover. Where the enterprise is of such a character that it may be justly so described, and breeds in the impartial mind a conviction that the use and benefit of the city is but a pretext disguising some foreign and ulterior end, we may easily deny to it the attributes of a city purpose. But the case must be a clear one, and so clear as to justify a reversal of the legislative judgment manifested by the enactment. No such state of facts exists here. When the Brooklyn park was planned the first step taken by the legislature was to authorize the appointment of a commission to select the site. They were not confined to the corporate limits, but were to act, not merely in view of the present condition, but also in view of the future growth and wants of the city. That example was followed in authorizing the New York commission. It was directed to recommend parks within the city and "the adjacent district of Westchester county." They were not left to stray at large. Their authority kept them near enough to

the city to subserve, in the judgment of the legislature, the city's use and convenience. They were also directed to act "having in view the present condition and future growth and wants of the city." That an ordinary city purpose may be, and often should be, planned and executed with reference as well to future as to present needs, cannot be denied. The city may lay out a wide street when a narrower one would answer present wants, and extend it beyond habitations and immediate needs. The city may erect a public building, having in view future necessities, and exceeding the demands of present use. That is often true economy and wise municipal administration. The adjoining district of Westchester county, in which a portion of the parks was located, is a triangle shut in between the city and the river on the east and west, and an extension to the river of the city's north line. That the current of city population will soon overflow this triangle and the corporate boundaries embrace it, the commission judged, and the legislature determined, thoughtfully, with deliberation, after careful study and investigation, upon facts not before us, and with the opportunity and the aid of personal examination. It would require a very clear and very strong case to justify a court in pronouncing such a conclusion to be but a fraudulent cover for some ulterior design foreign to the city's welfare. Such is not the case before us. We must assume what we can see is at least possible and perhaps probable, that the lands over the border are so near, so convenient of access, so likely to be overtaken and surrounded by the city's growth, so desirable for the health and recreation of the citizens, and so cheaply to be got in comparison with the consequences of delay, as to indicate a primary and predominant city purpose in a matter itself within the ordinary range of municipal action.

Much more might be added upon this interesting subject, but the reasonable limits of an opinion have long since and reluctantly been passed.

The order should be affirmed, with costs.

All concur, except RAPALLO, J., not voting.

Order affirmed.