(6 Misc. Rep. 516.)

KELLEY v. MAYOR, ETC., OF CITY OF NEW YORK et al.

(Supreme Court, Special Term, Putnam County. January, 1894.)

1. NUISANCE—POLLUTION OF STREAM SUPPLYING WATER TO CITY.
    The pollution of a stream supplying water to a city is a public nuisance, and therefore the right to empty a sewer into such stream cannot be acquired by prescription.

2. CONSTITUTIONAL LAW—TAKING PRIVATE PROPERTY FOR PUBLIC USE.
    Laws 1893, c. 189, (the Watershed Act,) authorizes the commissioner of public works to do all things necessary to preserve from pollution any of the sources of the water supply of New York city, and provides for the payment of all damages to property occasioned by any act in enforcing such statute. It also provides that the money for such payments shall be raised by the issuance of bonds, and that the bonds shall be provided for from time to time by taxation. *Held,* that the statute provides a certain, definite, and adequate mode of payment, such as answers the provision of the constitution that private property shall not be taken for public use without just compensation.

Action by Roxanna Kelley against the mayor, aldermen and commonalty of the city of New York and the commissioner of public works of that city to restrain them from entering on and interfering with the premises of plaintiff in Putnam county, in this state, through which premises runs a stream, about 35 feet in width, known as the "Middle Branch of the Croton River," through which stream the waters stored in the Middle Branch reservoir are conducted into the Croton river, and thence by the Croton lake and the aqueducts into the city of New York, where the water forms part of that used for drinking and domestic purposes. Complaint dismissed.

In April, 1893, the commissioner of public works of this city entered on the premises of plaintiff, claiming that her use of the same resulted in the befouling of the waters of the Middle Branch, built a cesspool upon plaintiff's premises, and turned into that cesspool a drain pipe, which, up to that time, had conducted fecal matter, waste water, slops, etc., from the water closets, etc., of the dwelling house of plaintiff to the Middle Branch of Croton river. The commissioner of public works also notified plaintiff that he would, unless she did so, move back from the banks of the Middle Branch her barns, stable, and pigsty, which he also claimed, especially in respect to an uncemented privy on the banks of the stream, constituted a source of pollution of the stream. Plaintiff then procured a temporary injunction restraining the further interference by the commissioner with her property, and her complaint demanded that this injunction be made permanent. The powers exercised by the commissioner in regard to what he had already done, and what he proposed to do on the premises of plaintiff, were by him claimed to be by virtue of his powers under what is known as the "Watershed Act," (chapter

189 of the Laws of 1893.)   The theory of the action of plaintiff was based on the alleged unconstitutionality of that act, and especially of the feature of the act which allows the taking of the property before the actual payment of compensation.

Benner & Benner, (Augustus S. Hutchins and Charles Benner, of counsel,) for plaintiff.

William H. Clark, Corp. Counsel, (Theodore Connoly, of counsel,) for defendants.

DYKMAN, J.   The water supply of the city of New York is derived entirely from the valley of the Croton river.   The watershed embraces an area of about 300 square miles in extent, and is drained by the three branches of the Croton, designated as the "Eastern," "Middle," and "Western."   These branches unite in the upper part of Westchester county, and the river runs on for several miles, until it receives the Muscoot river, which brings the water from Lake Mahopac, and then it flows into Croton lake.   When it had been determined that the valley of the Croton should be utilized for the procurement of water for the municipality, the legislature passed a law authorizing the city to acquire title to land by right of eminent domain for the construction of a dam and reservoir at the southerly end of the shed, for the impounding of the water, and an aqueduct to convey the water to the city.   Under that legislative authority, the dam, aqueduct, and reservoir were constructed, and the title to the land covered by water was acquired.   The reservoir is known as "Croton Lake."   It is a narrow, crooked body of water, about four miles in length.   The different branches of the Croton are augmented by numerous smaller streams; and upon their banks, and along the sides of the three branches, are barnyards, privies, pigsties, and other places where filth is collected and washed into the streams.   These places for the collection and deposition of filth and putrefaction became so numerous and so extensive, and so polluted the water, as to cause great alarm and anxiety among the inhabitants of the city.   Scientific and medical skill united in declaring the danger to health and life very great and very imminent, and, in answer to the demand for the adoption of some measure which might avert the peril by the removal of the cause, the legislature of the state, in March, 1893, passed an act entitled "An act to provide for the sanitary protection of the sources of the water supply of the city of New York."   Chapter 189, Laws 1893.   By section 1 of that act it was made lawful for the commissioner of public works of the city of New York to acquire or take in the manner thereinafter set forth, title to all real estate, and acquire or extinguish any interest therein of which the acquisition, taking, or extinguishment may be necessary for the sanitary protection of all rivers and other water courses, lakes, ponds, and reservoirs in the counties of Westchester, Putnam. and Dutchess, so far as they then were or thereafter might be used for the supply of water for the city of New York.   The mode of acquiring titles and the extinguishment of interests is prescribed in the law from section 2 to section 26, inclusive, and they are the

usual constitutional methods. By section 27 of the act the commissioner of public works is authorized to take such measures as may be necessary to preserve from pollution and defilement all the sources of the water supply in the three counties already mentioned, and to enter upon all lands near, adjacent, or contiguous to any of the sources of water supply, and to abate and remove the cause of any such pollution or defilement. All damage and injuries to property occasioned by any act under that section were to be ascertained and paid in accordance with the provision of the previous section of the act.

The plaintiff in this action owns about 100 acres of land in the town of Carmel, and the Middle Branch of the Croton runs through the westerly portion of her farm from north to south. Her barn and horse stables are on the east side of the stream, in close proximity to the bank, and her mansion is on the west side of the stream, a short distance from it. The drainage of her dwelling house, including that of the water closet, is let into the stream by a soil pipe, and is emptied there, and has been for many years. Upon the ascertainment of such facts, the commissioner of public works directed the removal of the barnyard, stables, pigsties, and outside privies upon the premises of the plaintiff, and caused a cesspool to be constructed upon her land, and the soil pipe to be conducted into the cesspool, so that the drainage from the house would run into it, and not into the stream of water. Thereupon the plaintiff commenced this action for the purpose of restraining the defendant and its officers from further interference with her property.

The action is based upon the theory of the unconstitutionality of the act of 1893, already mentioned. It will be profitable to ascertain the rights of these parties prior to that statute. It is the legal right of every riparian proprietor to have a stream of water which passes through his land flow in its natural condition, with its channel unchanged and its purity unimpaired. Such a right was vested in and pertained to the defendant as the owner of the bed of Croton lake, and the banks by which it was environed. That lake is, in fact, a running stream, through which 100,000,000 of gallons of water run daily in its onward progress to the city. The pollution of the water by the sewage from the plaintiff's house and the wash from the outbuildings was an invasion of the rights of the defendant, and also constituted a nuisance. Nuisances are of three kinds,—public, private, and mixed. They are public when they violate public rights, and produce a common injury; when they injure or annoy that portion of the public which necessarily comes in contact with it. They are private when the injury resulting from them violates only private rights, and produces damage to a few persons only. Mixed nuisances are those which are both public and private in their effects,—public, because they injure many persons, or all the community; and private, in that they also produce special injury to private rights. Wood, Nuis. p. 22. It is not always easy to determine the class to which any given injury is to be designated. In this case it is plain that the injury is not a mere private nuisance. Its injurious effects and fatal conse-

quences fall upon all who use the polluted water; and that may include not only the million and a half of inhabitants of the city, but also all who visit there. The nuisance created and continued by the plaintiff is either public or mixed, and, in my judgment, it is public, because it corrupts and poisons water which all have a right to use. It is, in its nature and consequences, an injury to all who come within the sphere of its operation; and that may be millions of human beings. The question is only important in reference to the right of the plaintiff to prescribe for the nuisance, for in this state no person can obtain a prescriptive right to maintain a public nuisance. Wood, Nuis. p. 743. It is presumed the same rule applies to a mixed nuisance, as that is in one sense public. I think, therefore, that the plaintiff cannot acquire a right by prescription to drain into this stream. But, even if she can, she has not introduced proof sufficient to establish the same. To do that, it was necessary for her to show that her use of the stream has actually invaded the rights of the defendant, and that the use and invasion of the right have produced an injury equal to and of the character complained of. Id. p. 726. The fact that a noxious trade or a harmful use has been continued for 20 years does not establish a prescriptive right to its exercise. It must be shown further, by the party asserting the right, that for the entire period the pollution has been as vile and extensive as that complained of, and, further, that the user, at the time of the action, is not substantially in excess of that exercised during the period requisite to acquire such right. Id.; also, page 728. In no view, therefore, has the plaintiff established any prescriptive right to defile the water in question. This plaintiff holds her property in subordination to the rule of law which requires her so to use it as not to interfere with the rights of her neighbor. That rule is the foundation of the police power of the state, which authorizes the legislature to pass laws for the protection of the health and safety of the public,—a power sufficient to warrant the destruction of property for the protection of the public health, without compensation. Van Wormer v. Albany, 15 Wend. 262; Meeker v. Van Rensselaer, Id. 398. Prior to the interference of the municipal authorities, the house sewage from the residence of the plaintiff, including human excrement, was drained into the middle branch of the Croton river. These discharges from the human system are very poisonous, and the sewage is poisonous if taken into the stomach. According to the testimony in this case, it is a germ carrier,— that is, it carries disease germs from the human system to the water; that these germs have the power of multiplying in the water, and a small number of them added to a large quantity of water will serve to infect the entire large body of water. It is therefore one of the most dangerous sources of pollution.

The plaintiff insists that the commissioner of public works has no power to interfere with the plaintiff, a citizen of Putnam county, in the enjoyment of her right to drain her premises into the running stream; but that contention is faulty—First, because the plaintiff never had the absolute right, free from all restriction, to drain

her sewage into the stream, as I have already stated. In the next place, it is not the commissioner of public works who is interfering. It is the legislature of the state that has interfered for the preservation of the public health. The case is novel. The city of New York has acquired the right to conduct the waters of the Croton river to that city for public use; and in all the statutes providing for the acquisition of land, or the extinguishment of riparian rights, it has been the declared purpose of the legislature to furnish the city of New York with a supply of pure and wholesome water. It must be assumed, therefore, that the city has the right to the water in its purity, free from all defilement, and fit for all domestic uses. It may be assumed that millions of people use this water in the city every year, and thus the public health and safety were jeopardized to an extent that justified the interposition of the legislature by virtue of the public power of the state to arrest the evil. The abatement of a nuisance detrimental to public health is one of the ordinary functions of the public power of the state, and the nuisance created by the plaintiff is of a flagrant character. That power is therefore adequate to afford an effectual remedy. Renwick v. Morris, 7 Hill, 575; Fertilizing Co. v. Hyde Park, 97 U. S. 667. The enormity of the offense will be more readily discerned if it be assumed that all the riparian proprietors within the Croton watershed have the right to commit the same nuisance as the plaintiff has perpetrated, and that the water is sent to the city freighted with the seeds of disease and death with which it would be thus contaminated. The disastrous results can hardly be conceived by the imagination. It is in the apprehension of such evils, and to preserve the public health, and to avert the danger to human life that the legislature has interfered for the sanitary protection of the sources of the water supply in the counties named. It is because the entire public is concerned. The commissioner of public works is selected as the appointed executor of the statute, probably because he has the requisite machinery at his command for its execution. There seems, therefore, to be sufficient reason for permitting the commissioner of public works to execute this law in the counties named therein. As I have already said, it is the state which has interfered for the sanitary protection of the sources of the water supply of the city, and has authorized the commissioner of public works to take such measures as may be necessary to preserve from pollution and defilement all the sources of the water supply, and at any time within three years to enter upon all lands contiguous to any such source of supply and abate and remove the cause of any such pollution or defilement. Then follows a provision for compensating all damages and injuries to property occasioned by any act under that section of the statute, and the commissioner of public works is required to institute proceedings, under the provisions of that act, within 10 days, to ascertain the damage and injury to property occasioned by the abatement of the causes of pollution. If such proceedings be not so instituted, then any person injured may commence an action for the recovery of the damages sustained. The money to pay for the property taken and rights extinguished,

and all damages and expenses to the extent of $500,000 a year, is to be raised by the issuance of bonds by the comptroller. The board of aldermen of the city is directed to raise, from time to time, by tax upon the real and personal property in the city, the sum of money required to pay the interest upon such, bonds, and to pay them at maturity. So far as property right can be acquired in water actually appropriated to practical use for domestic and other purposes, such right has been acquired in the waters of the Croton river by the city of New York. The purpose is a public one, and the power to exercise the right of eminent domain for its acquisition, and for the acquirement of the land and the extinguishment of rights necessary for its control and utilization, has been delegated to the mayor, aldermen, and commonalty of the city of New York. The great objection to the statute in question is that it undertakes to vest the title to the property taken or injured in the city before the final order for the confirmation of the report in the condemnation proceedings, but the objection is invalid. As law is settled in this state at the present day, it is within the competence of the legislature to authorize municipal corporations to take private property for public use without first making payment, provided a certain and adequate provision is made, by which the owner can coerce compensation, through the judicial tribunals or otherwise, without unreasonable delay. 2 Dill. Mun. Corp. § 615; Cooley, Const. Lim. 692. The same question was presented and decided by the general term in this department in the case of Mayor, etc., v. Wright, 12 N. Y. Supp. 20, under a provision in the act for the construction of the new aqueduct, which was precisely like the provision in the statute; and it was there held that the constitutional requirement of the compensation was satisfied by a provision for certain and adequate payment, which can be made available by the owner. The same question was decided the same way in Re Mayor, etc., 99 N. Y. 569, 2 N. E. 642. The synopsis of the statute given above is sufficient to show that it provides a certain, definite, and adequate mode of payment to the plaintiff for all damages she may sustain. It must be borne in mind that it is the intention and scheme of this act to pay for all property taken, for all injury or damage done, and for all rights extinguished. My examination conducts me to the conclusion that the enactment of the statute in question was a valid exercise of legislative power, and is not violative of the constitution of the state or of the United States; that its execution ought not to be arrested by the courts. This action is destitute of merit, and the complaint of the plaintiff. should be dismissed, with costs.