In re GILROY.

In re PURDY.

(Supreme Court, Appellate Division, Second Department. July 7, 1898.)

1. EMINENT DOMAIN—POWER OF AQUEDUCT COMMISSIONERS.
    Under Laws 1883, c. 490, "to provide new reservoirs, dams, and a new aqueduct * * * for the purpose of supplying the city of New York with an increased supply of pure and wholesome water," the aqueduct commissioners were authorized to take whatever area was necessary for the proper construction, maintenance, and operation thereof, including such lands as were necessary to protect the water supply from pollution or injury.

2. SAME—COMPENSATION OF OWNER.
    If an act authorizing the condemnation of land for public purposes provides for a certain and definite and adequate source and manner of pay-

ment therefor to the owner, its constitutionality is not impaired by the fact that it provides that payment shall be made after, instead of when, the land is taken.

Appeal from special term, Westchester county.

In the matter of the petition of Thomas F. Gilroy, commissioner of public works of the city of New York, under Laws 1883, c. 490, and the laws amendatory thereof, on behalf of the mayor, aldermen, and commonalty of the city of New York, for appointment of commissioners of appraisal. From an order appointing the same for the acquirement of lands for the new Croton dam in Westchester county, Isaac Purdy appeals. Affirmed.

Argued before GOODRICH, P. J., and CULLEN, BARTLETT, HATCH, and WOODWARD, JJ.

Richard L. Sweezy, for appellant.

H. T. Dykman, for respondent.

GOODRICH, P. J. The act known as "Chapter 490 of the Laws of 1883" is entitled "An act to provide new reservoirs, dams and a new aqueduct with the appurtenances thereto, for the purpose of supplying the city of New York with an increased supply of pure and wholesome water." It appointed the mayor and certain other officials of the city of New York, and certain other individuals, aqueduct commissioners, to carry out the provisions of the act. The commissioner of public works was directed to prepare plans, maps, etc., for the construction of a new aqueduct for the city, "and for the construction of one or more dams and reservoirs to detain such water, and for the construction of such sluices, culverts, canals, pumping works, bridges, tunnels, blow-offs, ventilating shafts, and other appurtenances as may be necessary to the proper construction, maintenance, or operation of such aqueduct, dams, and reservoirs." These plans and maps were to be filed, and open to public inspection; and the aqueduct, dams, and reservoirs were to be constructed in accordance thereto. This was done, and opportunity was given to all persons interested to be heard. Public notice was given, and after the close of the hearing this application was made for the appointment of commissioners of appraisal in accordance with section 6 of the act. Isaac Purdy, the owner of parcels numbered 507 and 514 on the map in question, filed an answer presenting two objections: "(1) That his land, proposed to be taken, was not acquired for, or intended to be used in, the construction, maintenance, or operation of the dam or reservoir mentioned in the petition, and that, therefore, no authority existed in the act for the taking of the same; and (2) that the act was unconstitutional by reason of various facts alleged." The issues thus raised by petition and answer were tried at special term, where a decision was made containing the following: "That the acquisition of the real estate shown on said maps is necessary and required, and is intended to be used for the construction, maintenance, and operation of the dam and reservoir mentioned in the petition herein." The court thereupon appointed three commissioners of appraisal, and from this order Mr. Purdy appeals.

The petition was filed in October, 1896. In 1893 the legislature had passed another act (chapter 189, Laws 1893), which provided that the commissioner of public works might, within three years of the passage of the act, take proceedings to acquire or take title to any real estate, "for the sanitary protection of all rivers, and other water-courses, lakes, ponds and reservoirs in the counties of Westchester, Putnam and Dutchess, so far as the same now are, or hereafter may be, used for the supply of water for the city of New York." It will be observed that the petition makes no reference to this act, and the proceedings were not taken in pursuance thereof, doubtless because three years have passed since the enactment of it. So that the only authority to be considered on this appeal is that conferred by the act of 1883 and its amendments, and to this we must resort exclusively to ascertain the extent and limitation of the powers of the commissioners. The act of 1883 (chapter 490, §§ 9, 10) provides that the commissioners of appraisal appointed by the court shall take, subscribe, and file the oath prescribed by article 12 of the constitution, providing for the faithful discharge of duty, etc., and, upon such filing, "the said mayor, aldermen, and commonalty of the city of New York shall be and become seized in fee of all those parcels of real estate which are on the maps in the fourth section referred to described as parcels, of which it has been determined by said aqueduct commissioners that the fee should be acquired." The decision of the aqueduct commissioners as indicated in the filing of the maps, plans, etc., is final and conclusive as to the lands necessary to be taken for the purpose of the act. They were not confined to an area which would be overflowed with water by reason of the construction of the dam across the course of the Croton river. They were authorized to take whatever area was necessary for the proper construction, maintenance, and operation of such aqueduct, dam, and reservoir. This includes the taking of lands which were likely to be overflowed even in extraordinary freshets, or which were necessary to protect the water supply from pollution or injury. The testimony shows the following facts: The map contains a red line representing the boundary line of the land taken for the construction of the works. Inside this line are two dotted lines; the one representing the ordinary high-water mark, and the other the extreme high-water mark, as they were when the dam was completed. These lines represent what may be termed a "contour line" or water-level line. Between the extreme high-water mark line and the red boundary line is situated the land which is taken "for the purpose of securing the waters to be contained in the reservoir from pollution around the borders, and for the purpose of securing a certain amount of property over which the city will have juisdiction, so as to prevent nuisances from establishing themselves near the flow line," as appears by the testimony of the chief engineer of the aqueduct commissioners. He adds:

"I consider it a matter of absolute necessity, second only to the procuring of the water itself, in view of the fact that the aqueduct commissioners, in whose service I have been for the past 12 years, must procure pure water for the city of New York, and that purity could not be procured or maintained without having an ample margin of land outside of the high-water line of the reservoir. Q. Has such a margin always been maintained in Croton water

sheds when reservoirs have been constructed? * * * Q. Have such zones always been maintained? A. They have, except in cases of the old Croton Lake, 60 years ago, where it was not always done, and we find the bad result of it, and have every year since. Q. In your opinion as engineer, have you, in this proceeding, delineated upon this map any more property than you deem to be necessary for the protective purposes you have mentioned? A. In no case whatever."

We hold, therefore, that the taking of these lands was a proper exercise of authority, and that the city has acquired title to the fee of said lands.

The second contention of the appellant, namely, that the act is unconstitutional because it takes private property for public use without immediate compensation made coincident with the taking, is untenable. Whatever might have been my own opinion upon this subject as an original proposition, the question is no longer a subject for discussion. The principle is settled by abundant authority, but it is necessary only to cite In re Mayor, etc., of City of New York, 99 N. Y. 569, 2 N. E. 642, where the court unanimously concurred in the opinion of Finch, J., who said (pages 577, 578, 99 N. Y., and pages 643, 644, 2 N. E.):

"While it is not necessary, in advance of the taking, to pay to the landowner his compensation, it is necessary that the act which invades his ownership shall provide for a certain and definite and adequate source and manner of payment. Sage v. City of Brooklyn, 89 N. Y. 189. This necessity is vital, and of the most essential character, since, if unheeded or disregarded, it transforms the right of eminent domain into a legalized plunder of the citizen. But this act does not so offend. It puts the public purse of the city behind the debt as the source of its payment. By section 4 the municipality is required, within four calendar months after the confirmation of the report of the commissioners, to pay the compensation awarded to the parties interested; and, if payment be not so made, those to whom it is due may, after demand, maintain an action against the city. Nothing in this record shows that the municipality has already reached the limits of its capacity to contract debt, or cannot legally incur the new liability. There is no ambiguity or uncertainty about th's provision, and the citizen is not turned over to the blind remedy of uncertain and complicated assessments, and a devious and doubtful litigation."

The act in question provides, within the language of this opinion, for the issue of bonds sufficient to pay all damages caused by the taking of property; and this is ample protection for the appellant, within the authorities.

The order must be affirmed, with costs.

Order affirmed, with $10 costs and disbursements. All concur.