ROXANNA KELLEY, Appellant, *v.* THE MAYOR, ALDERMEN AND COM-
MONALTY OF THE CITY OF NEW YORK and MICHAEL T. DALY, as
Commissioner of Public Works of the City of New York,
Respondents.

*Nuisances — their kinds and the abatement thereof—no right to maintain a public
nuisance can be obtained by prescription — rights of riparian owners in streams —
chap. 189 of 1893 — not in violation of the Constitution of New York or of the
United States — the commissioner of public works of New York city can abate nui-
sances under said act.*

Nuisances are of three kinds: public, private and mixed. They are public when
they violate public rights and produce a common injury. They are private
when the injury resulting from them violates only private rights and produces
damage to a few persons only. Mixed nuisances are those which are both
public and private in their effect, public because they injure many persons,
and private in that they also produce special injury to private rights.

In the State of New York no person can obtain a prescriptive right to maintain a
public nuisance.

The abatement of a nuisance detrimental to public health is one of the ordinary
functions of the police power of the State.

It is the legal right of every riparian proprietor to have a stream of water, which
passes through his land, flow in its natural condition, with its channel unchanged
and its purity unimpaired.

Upon the trial of an action brought to restrain the commissioner of public works
of the city of New York from further interfering with the property of the plain-
tiff, it appeared that the plaintiff was the owner of about 100 acres of land,
through the westerly portion of which ran the middle branch of the Croton
river; that said stream was embraced within the watershed of the valley of the
Croton river, from which was derived the water supply of the city of New
York, and that so far as property rights can be acquired in water actually
appropriated to practical use for domestic and other purposes, such right had
been acquired in the waters of the Croton river by the city of New York; that
plaintiff's barn and horse stable were on the east side of the stream, in close prox-
imity to the bank, and her house was on the west side of the stream a short dis-
tance from it; that the drainage of her house, including that of the water closet,
was let into the stream by a soil pipe and was emptied there, and had been for
many years; that the commissioner of public works of the city of New York
directed the removal of the barnyard, stables, etc., upon the premises of the
plaintiff, and caused a cesspool to be constructed upon her land, and the soil
pipes to be conducted into the cesspool, so that the drainage from the house
would run into it and not into the stream.

*Held,* that the plaintiff could not acquire a right by prescription to drain into the
stream; that she had created a public nuisance, which the commissioner of pub-

lic works of the city of New York was authorized to abate by chapter 189 of the Laws of 1893, which authorized him to take such measures as might be necessary to preserve from pollution all the sources of the water supply of the city of New York, and at any time within three years to enter upon all lands contiguous to any such source, and abate and remove the cause of any such pollution; that the objection to said act, that it undertook to vest the title to the property taken or injured in the city of New York before the granting of the final order for the confirmation of the report in the condemnation proceeding provided for in said act, was untenable, as a certain and adequate provision was made, by which the owner could obtain compensation through the judicial tribunals or otherwise, without unreasonable delay; that said statute was a valid exercise of the legislative power, and was not violative of the Constitution of the State of New York or of the United States.

APPEAL by the plaintiff, Roxanna Kelley, from a judgment of the Supreme Court in favor of the defendants, entered in the office of the clerk of the county of Putnam on the 27th day of April, 1894, upon the decision of the court, rendered after a trial at the Putnam Special Equity Term, dismissing the plaintiff's complaint upon the merits.

*A. S. Hutchins,* for the appellant.

*Francis M. Scott, Theodore Connoly* and *T. Farley,* for the respondents.

Present — BROWN, P. J., and PRATT, J.; DYKMAN, J., not sitting.

Judgment affirmed, with costs, on opinion at Special Term.

The opinion of the Special Term was as follows:

DYKMAN, J.:

The water supply of the city of New York is derived entirely from the valley of the Croton river. The watershed embraces an area of about 300 square miles in extent, and is drained by the three branches of the Croton, designated as the eastern, middle and western. These branches unite in the upper part of Westchester county, and the river runs on for several miles until it receives the Muscoot river, which brings the water from Lake Mahopac and then it flows into Croton lake.

When it had been determined that the valley of the Croton should be utilized for the procurement of water for the municipality the Legislature passed a law authorizing the city to acquire title to land

by right of eminent domain for the construction of a dam and reservoir at the southerly end of the watershed for the impounding of the water, and an aqueduct to convey the water to the city under that legislative authority; the dam, aqueduct and reservoir were constructed and the title to the land covered by water was acquired. The reservoir is known as Croton lake  It is a narrow crooked body of water about four miles in length.  The different branches of the Croton are augmented by numerous smaller streams, and upon their banks and along the sides of the three branches are barnyards, privies, pigsties, and other places where filth is collected and washed into the streams.

These places for the collection and deposition of filth and putrefaction became so numerous and so extensive and so polluted the water as to cause a great alarm and anxiety among the inhabitants of the city.

Scientific and medical skill united in declaring the danger to health and life very great and very imminent, and in addition to the demand for the adoption of some measure which might avert the peril by the removal of the cause, the Legislature of the State, in March, 1893, passed an act entitled "An act to provide for the sanitary protection of the sources of the water supply of the city of New York." (Chap. 189, Laws of 1893.)

By section 1 of that act it was made lawful for the commissioner of public works of the city of New York to acquire or take in the manner thereinafter set forth title to all real estate and acquire or extinguish any interest therein of which the acquisition, taking or extinguishment might be necessary for the sanitary protection of all rivers and other watercourses, lakes, ponds and reservoirs in the counties of Westchester, Putnam and Dutchess, so far as they then were or thereafter might be used for the supply of water for the city of New York.

The mode of acquiring title and the extinguishment of interests is prescribed in the law from section 2 to section 26 inclusive, and they are the usual constitutional methods.   By section 27 of the act the commissioner of public works is authorized to take such measures as may be necessary to preserve from pollution and defilement all the sources of the water supply in the three counties already mentioned and to enter upon all lands near or adjacent or contigu-

ous to any of the sources of water supply and to abate and remove the cause of any such pollution or defilement. All damages and injuries to property occasioned by any act under that section were to be ascertained and paid in accordance with the provision of the previous section of the act.

The plaintiff in this action owns about 100 acres of land in the town of Carmel, and the middle branch of the Croton runs through the westerly portion of her farm from north to south. Her barn and horse stable are on the east side of the stream, in close proximity to the bank, and her mansion is on the west side of the stream, a short distance from it. The drainage of her dwelling house, including that of the water closet, is let into the stream by a soil pipe, and is emptied there, and has been for many years.

Upon the ascertainment of such facts the commissioner of public works directed the removal of the barnyard, stables, pigsties and outside privies upon the premises of the plaintiff, and caused a cesspool to be constructed upon her land and the soil pipes to be conducted into the cesspool, so that the drainage from the house would run into it and not into the stream of water.

Thereupon the plaintiff commenced this action for the purpose of restraining the city and its officers from further interference with her property.

The action is based upon the theory of the unconstitutionality of the act of 1893, already mentioned.

It will be profitable to ascertain the rights of these parties prior to that statute.

It is the legal right of every riparian proprietor to have a stream of water which passes through his land flow in its natural condition, with its channel unchanged and its purity unimpaired.

Such a right was vested in and pertained to the city as the owner of the bed of Croton lake and the banks by which it was environed. That lake is, in fact, a running stream, through which 100,000,000 of gallons of water run daily in its onward progress to the city.

The pollution of the water by the sewage from the plaintiff's house and the wash from the outbuildings was an invasion of the rights of the city, and also constituted a nuisance.

Nuisances are of three kinds, public, private and mixed.  They are public when they violate public rights and produce a common injury; when they injure or annoy that portion of the public which necessarily comes in contact with them.  They are private when the injury resulting from them violates only private rights, and produces damage to a few persons only.

Mixed nuisances are those which are both public and private in their effects; public because they injure many persons or all the community, and private in that they also produce special injury to private rights.  (Wood on Nuisances, 22.)

It is not always easy to determine the class to which any given injury is to be designated.

In this case it is plain that the injury is not a mere private nuisance.

Its injurious effects and fatal consequences fall upon all who use the polluted water, and that may include not only the million and a half inhabitants of the city, but all who visit there.

The nuisance created and continued by the plaintiff is either public or mixed, and, in my judgment, it is public, because it corrupts and poisons water which all have a right to use.  It is in its nature and consequences an injury to all who come within the sphere of its operations, and that may be millions of human beings.

The question is only important in reference to the right of the plaintiff to prescribe for the nuisance, for in this State no person can obtain a prescriptive right to maintain a public nuisance.  (Wood on Nuisances, 743.)  It is presumed the same rule applies to a mixed nuisance as that is in one sense public.

I think, therefore, that the plaintiff cannot acquire a right by prescription to drain into this stream.

But even if she can, she has not introduced proof sufficient to establish the same.

To do that it was necessary for her to show that her use of the stream has actually invaded the rights of the defendant, and that the use and invasion of the right have produced an injury equal to and of the character complained of.  (Wood on Nuisances, 726.)

The fact that a noxious trade or a harmful use has been continued for twenty years does not establish a prescriptive right to its exercise.

It must be shown further by the party asserting the right that for

the entire period the pollution has been as vile and extensive as that complained of, and further, that the user, at the time of the action, is not substantially in excess of that exercised during the period requisite to acquire such right. (Wood on Nuisances, 726, 728.)

In no view, therefore, has the plaintiff established any prescriptive right to defile the water in question.

This plaintiff holds her property in subordination to the rule of law which requires her so to use it as not to interfere with the rights of her neighbor. That rule is the foundation of the police power of the State, which authorizes the Legislature to pass laws for the protection of the health and safety of the public, a power sufficient to warrant the destruction of property for the protection of the public health without compensation. ( Van Wormer v. The Mayor, 15 Wend. 262; Meeker v. Van Rensselaer, Id. 398.)

Prior to the interference of the municipal authorities the house sewerage from the residence of the plaintiff, including human excrement, was drained into the middle branch of the Croton river. These discharges from the human system are very poisonous, and the sewage is poisonous if taken into the stomach. According to the testimony in this case it is a germ carrier, that is, it carries disease germs from the human system to the water; that these germs have the power of multiplying in the water, and a small number of them, added to a large quantity of water, will serve to infect the entire large body of water. It is, therefore, one of the most dangerous sources of pollution.

The plaintiff insists that the commissioner of public works has no power to interfere with the plaintiff, a citizen of Putnam county, in the enjoyment of her right to drain her premises into the running stream, but that contention is faulty, first, because the plaintiff never had the absolute right free from all restriction to drain her sewage into the stream as I have already stated.

In the next place it is not the commissioner of public works who is interfering. It is the Legislature of the State that has interfered for the preservation of the public health.

The case is novel. The city of New York has acquired the right to conduct the waters of the Croton river to that city for public use, and in all the statutes providing for the acquisition of land or the extinguishment of riparian rights it has been the declared pur-

pose of the Legislature to furnish the city of New York with a supply of pure and wholesome water.

It must be assumed, therefore, that the city has the right to the water in its purity, free from all defilement, free from all pollution, and fit for all domestic uses.

It may be assumed that millions of people use this water in the city every year and thus the public health and safety was jeopardized to an extent that justified the interposition of the Legislature by virtue of the police power of the State to arrest the evil.

The abatement of a nuisance detrimental to public health is one of the ordinary functions of the police power of the State, and the nuisance created by the plaintiff is of a flagrant character. The power is, therefore, adequate to afford an effectual remedy. (*Renwick* v. *Morris*, 7 Hill, 575 ; *Fertilizing Co.* v. *Hyde Park*, 97 U. S. 667.)

The enormity of the offense will be more readily discerned if it be assumed that all the riparian proprietors within the Croton watershed have the right to commit the same nuisance as the plaintiff has perpetrated and that the water is sent to the city freighted with the seeds of disease and death with which it would be thus impregnated. The disastrous results can hardly be conceived by the imagination.

It is from an apprehension of such evils and in order to preserve the public health and to avert the danger to human life that the Legislature has interfered for the sanitary protection of the sources of the water supply in the counties named. It is because the entire public is concerned.

The commissioner of public works is selected as the appointed executor of the statute probably because he has the requisite machinery at his command for its execution.

There seems, therefore, to be sufficient reason for permitting the commissioner of public works to execute this law in the counties named therein.

As I have already said, it is the State which has interfered for the sanitary protection of the sources of the water supply of the city, and has authorized the commissioner of public works to take such measures as may be necessary to preserve from pollution and defilement all the sources of the water supply, and at any time

within three years to enter upon all lands contiguous to any such source of supply and abate and remove the cause of any such pollution or defilement.

Then follows a provision for compensating all damages and injuries to property occasioned by any act under that section of the statute, and the commissioner of public works is required to institute proceedings under the provisions of that act within ten days to ascertain the damage and injury to property occasioned by the abatement of the causes of pollution.

If such proceedings be not so instituted, then any person injured may commence an action for the recovery of the damages sustained.

The money to pay for the property taken and rights extinguished and all damages and.expenses, to the extent of $500,000 a year, is to be raised by the issuance of bonds by the comptroller.

The board of aldermen of the city is directed to raise from time to time, by tax upon the real and personal property in the city, the sum of money required to pay the interest upon such bonds and to pay them at maturity.

So far as property right can be acquired in water actually appropriated to practical use for domestic and other purposes, such right has been acquired in the waters of the Croton river by the city of New York. The purpose is a public one, and the power to exercise the right of eminent domain for its acquisition, and for the acquirement of the land and for the extinguishment of rights necessary for its control and utilization, has been delegated to the mayor, aldermen and commonalty of the city of New York.

The great objection raised against the statute in question is that it undertakes to vest the title to the property taken or injured in the city before the final order for the confirmation of the report in the condemnation proceedings, but the objection is invalid.

As law is settled in this State at the present day it is within the power of the Legislature to authorize municipal corporations to take private property for public use without first making payment, provided a certain and adequate provision is made by which the owner can obtain compensation through the judicial tribunals, or otherwise, without unreasonable delay. (2 Dillon on Mun. Corp. § 615; Cooley's Const. Lim. [5th ed.] 694.)

The same question was presented and decided by the General

Term in this department in the case of *The Mayor* v. *Wright* (12 N. Y. Supp. 20) under a provision in the act for the construction of the new aqueduct, which was precisely like the provision in the statute, and it was there held that the constitutional requirement of the compensation was satisfied by a provision for certain and adequate payment which can be made available by the owner.

The same question was decided the same way in *The Matter of the Mayor* (99 N. Y. 569).

The synopsis of the statute given above is sufficient to show that it provides a certain, definite and adequate mode of payment to the plaintiff for all damages she may sustain. It must be borne in mind that it is the intention and scheme of this act to pay for all property taken, for all injury or damage done, and for all rights extinguished.

My examination conducts me to the conclusion that the enactment of the statute in question was a valid exercise of legislative power and is not violative of the Constitution of the State or of the United States and that its execution ought not to be arrested by the courts.

This action is destitute of merits and the complaint of the plaintiff should be dismissed, with costs.