THE PEOPLE OF THE STATE OF NEW YORK ex rel. METROPOLITAN STREET RAILWAY COMPANY, Respondent, v. STATE BOARD OF TAX COMMISSIONERS, Appellant.

THE PEOPLE OF THE STATE OF NEW YORK ex rel. THE TWENTY-THIRD STREET RAILWAY COMPANY, Respondent, v. STATE BOARD OF TAX COMMISSIONERS, Appellant.

THE PEOPLE OF THE STATE OF NEW YORK ex rel. THE CENTRAL CROSSTOWN RAILROAD COMPANY, Respondent, v. STATE BOARD OF TAX COMMISSIONERS, Appellant.

THE PEOPLE OF THE STATE OF NEW YORK ex rel. CONSOLIDATED GAS COMPANY OF NEW YORK, Respondent, v. STATE BOARD OF TAX COMMISSIONERS, Appellant.

THE PEOPLE OF THE STATE OF NEW YORK ex rel. BROOKLYN CITY RAILROAD COMPANY, Respondent, v. STATE BOARD OF TAX COMMISSIONERS, Appellant.

THE PEOPLE OF THE STATE OF NEW YORK ex rel. CONEY ISLAND AND BROOKLYN RAILROAD COMPANY, Respondent, v. STATE BOARD OF TAX COMMISSIONERS, Appellant.

THE PEOPLE OF THE STATE OF NEW YORK ex rel. NEW AMSTERDAM GAS COMPANY, Respondent, v. STATE BOARD OF TAX COMMISSIONERS, Appellant.

1. CONSTITUTIONAL LAW — TRANSFER OF ESSENTIAL FUNCTIONS OF LOCAL OFFICERS TO STATE OFFICERS PROHIBITED — HOME RULE PROVISION CONST. ART. 10, § 2.   The home rule provision of the Constitution (art. 10, § 2) providing that "all city, town and village officers, whose election or appointment is not provided for by this Constitution, shall be elected by the electors of such cities, towns and villages, or of some division thereof, or appointed by such authorities thereof, as the Legis-

27

lature shall designate for that purpose," protects all essential or exclusive functions theretofore belonging to local officers and prohibits their transfer, whether direct or indirect, to state officers.

2. CONSTRUCTION OF HOME RULE PROVISION AS AFFECTING TAXATION. This provision, however, when invoked in relation to taxation should be considered in connection with the supreme taxing power of the legislature and neither should be so construed as to embarrass or cripple the other. Home rule, as understood and practiced in the past, giving to localities the right to govern themselves, but not to hamper the government of the state, should be carefully protected from open attack or indirect invasion. Shadows, however, should give way to substance, and the right to create a new system of taxation and bring in property of a new character, hitherto untaxed, with some other property incidental thereto and worthless without it, cannot be denied upon principle and should not be withheld from the legislature.

3. CORPORATIONS — GENERAL FRANCHISES DEFINED. The general franchise of a corporation is its right to live and do business by the exercise of the corporate powers granted by the state. Such franchise, however, gives the corporation no right to do anything in the public highways without special authority from the state or some municipal officer or body acting under its authority.

4. SPECIAL FRANCHISES DEFINED. A special franchise is the right granted to a corporation to construct, maintain or operate in a public highway some structure intended for public use, which except for the grant would be a trespass.

5. TAX — SPECIAL FRANCHISE TAX ACT — L. 1899, CH. 712 — SUBSTANCE OF STATUTE. Chapter 712 of the Laws of 1899, amending the General Tax Law and authorizing for the first time in the history of the state the assessment or valuation for the purpose of general taxation of all special franchises by a state board of tax commissioners appointed by the governor, declares in substance that the right, authority or permission to construct, maintain or operate some structure, intended for public use, "in, under, above, on or through streets, highways, or public places," such as railroads, gas pipes, water mains, poles and wires for electric, telephone and telegraph lines, and the like, is a special franchise. For the purpose of taxation such a franchise is made real estate and is "deemed to include the value of the tangible property of a person, copartnership, association or corporation situated in, upon, under or above any street, highway, public place or public waters in connection with the special franchise," and taxed as a part thereof. (§ 2, subd. 3.) This includes nothing but what is in the street, directly or indirectly, and excludes power houses, depots and all structures without the lines of the street. The taxes thus imposed are for general purposes, are collected in the same way, and used for the same objects as other taxes upon the general assessment roll.

6. ACT NOT VIOLATIVE OF HOME RULE PROVISION — IT CREATES NEW SYSTEM OF TAXATION, REQUIRING OFFICERS WITH NEW FUNCTIONS TO

1903.]   People ex rel. Met. St. Ry. Co. v. Tax Comrs.   419

N. Y. Rep.]                    Statement of case.

Enforce It — Tangible Property Connected with Special Fran-
chises is an Inseparable Part Thereof, Forming an Entity Which
was Never Taxable by Local Assessors. The fact that such statute
confers upon state officers the right to assess such franchises and especially
the right to assess the tangible property annexed thereto and included
therein by the act, which was formerly assessed by local boards of assess-
ors, does not violate the principle of home rule embodied in the Constitu-
tion. 1. Because it creates a new system of taxation and brings within
its range a new character of property, which required new methods of
valuation and the exercise of functions which never belonged to local
assessors and must necessarily have been committed to state officers
with new functions whose sole duty related to the subject of taxation in
all its phases throughout the entire state, and who, with wider experience
and greater opportunities for observation than local assessors, would
be able to grasp the new scheme of taxation as a whole and whose
action would be free from all local prejudice or color and uniform in its
result. 2. Because the tangible property formerly assessed by local
assessors is an inseparable part of the special franchises mentioned in the
statute, constituting with them a new entity, which in a going concern
can neither be assessed nor sold to advantage except as one thing, single
and entire, and the function of assessing such entity is not essentially
local in character, never belonged to localities, never was and never could
be exercised with the requisite justice and uniformity by their officers,
and, therefore, was of necessity conferred upon state officers, expert tax
officials, having a jurisdiction coextensive with the limits of the state.
Property, therefore, created by the legislature and never intrusted by it to
local assessors cannot with propriety be said to have been taken away
from them.

7. Authorities on Home Rule Question Collated. The authori-
ties relating to the home rule provision of the Constitution collated and
discussed.

8. Decisions, Not Expressions of Judges Used Arguendo, Estab-
lish Legal Principles. Legal principles are not established by expres-
sions of learned judges, used *arguendo* in their opinions in a given case, but
by what was decided therein, and what is written is not evidence of what
was decided unless it relates directly to the question presented for decision.

9. Franchises Taxable as Other Property — Act Is Not Vio-
lative of Federal Constitution as Impairing the Obligation of
Contracts. A franchise, whether general or special, is taxable the same
as other property, and, therefore, the statute taxing special franchises,
which changes no part of the grant, alters no stipulation, increases no
payment, exacts nothing from their owners that is not exacted from the
owners of property generally, does not impair the obligation of a contract
and cannot be regarded as violating the Federal Constitution.

10. Additional Objections Overruled. Contentions that the act is
impracticable and incapable of execution; that the special franchises

should have been separately assessed; that the state tax commissioners adopted no rule in making the assessments; that the relators did not have a proper hearing at the time provided for review, and that due process of law was not observed in the taxation of their property, after due consideration, are overruled.

*People ex rel. Met. St. Ry. Co.* v. *Tax Comrs.*, 79 App. Div. 184, reversed.

*People ex rel. T. T. St. Ry. Co.* v. *Tax Comrs.*, reversed.

*People ex rel. C. C. R. R. Co.* v. *Comrs.*, reversed.

*People ex rel. N. A. Gas Co.* v. *Tax Comrs.*, 79 App. Div. 643, reversed.

*People ex rel. C. Gas Co.* v. *Tax Comrs.*, 79 App. Div. 643, reversed.

*People ex rel. C. I. & B. R. R. Co.* v. *Tax Comrs.*, 79 App. Div. 643, reversed.

*People ex rel. B. C. R. R. Co.* v. *Tax Comrs.*, 79 App. Div. 643, reversed.

(Argued April 6, 1903; decided April 28, 1903.)

APPEAL in each of the above-entitled proceedings from an order of the Appellate Division of the Supreme Court in the third judicial department, entered January 30, 1903, which reversed an order of Special Term reducing and confirming as reduced an assessment upon the special franchises of the respective relators.

The assessments in question were made in the year 1900, pursuant to the provisions of the Tax Law, as amended by chapter 712 of the Laws of 1899. Separate writs of certiorari, granted to review the respective assessments, resulted in an order in each proceeding appointing a referee to take and report to the Supreme Court such evidence upon the several issues raised by the petition, writ and return as might be adduced before him by the parties, with his findings of fact and conclusions of law thereon. After taking many pages of evidence the referee made separate and complete findings of fact appropriate to each proceeding, and as conclusions of law in each found " that chapter 712 of the Laws of 1899 is a valid and constitutional enactment, practicable and operative, and that it gave authority to the defendants to assess the relator's special franchises for the purpose of assessment and taxation; that the relator had a hearing and due process of law before the defendants upon the review of its assessment * * * and was not deprived of any of its legal or constitutional

1903.] People ex rel. Met. St. Ry. Co. *v.* Tax Comrs. 421

N. Y. Rep.] Points of counsel.

rights; that it was lawful to assess as one franchise the franchise, right, authority or permission which the relator had in the streets of New York and which it operated as one system; that to equalize its assessment with the assessment of other real property in the city of New York, the relator is entitled to a deduction," the amount being named in each proceeding, " and that the assessment as thus reduced must be taken as the value of the relator's special franchise for the purposes of assessment and taxation under the act."

The Supreme Court adopted the findings both of fact and law made by the referee and directed that final orders be entered in accordance therewith. From the order so entered in each proceeding the relator therein appealed to the Appellate Division, which affirmed as to the facts but reversed as to the law, upon the ground that the statute in question was in violation of the " home rule" provision of the Constitution. Two of the justices dissented. The State Board of Tax Commissioners appealed to this court from the several orders entered accordingly.

*John Cunneen, Attorney-General ( William H. Wood* of counsel), for appellant. The entire statute is valid. There is no arbitrary line which separates the official functions which properly belong to local officers from those which properly belong to state officers. The power to make the distinction is vested in the legislature. (Const. of 1777, § 20; Const. of 1821, art. 4, § 15; Const. of 1846, art. 10, § 2; *Matter of Henneberger,* 155 N. Y. 421; *People ex rel.* v. *Albertson,* 55 N. Y. 50; *Matter of N. Y. D. Ry. Co.,* 42 Hun, 621; 107 N. Y. 42; *People ex rel.* v. *Lorillard,* 135 N. Y. 285; *Rathbone* v. *Wirth,* 150 N. Y. 459; *N. Y. F. Dept.* v. *A. S. Co.,* 106 N. Y. 577; *People* v. *Cheritree,* 6 T. & C. 473; *Greaton* v. *Griffin,* 4 Abb. Pr. [N. S.] 310; *Hanlon* v. *Bd. of Suprs.,* 57 Barb. 383; *City of Syracuse* v. *Hubbard,* 64 App. Div. 587.) It is within the power of the legislature to create a new office to be filled by a state officer and to transfer the power of valuing property to it, even though this power has, since before

1777, been exercised by local assessors. (*Matter of Allison v. Welde,* 172 N.Y. 421; *People v. Raymond,* 37 N. Y. 431.) The subject of assessment and taxation is the "right," "privilege" or "franchise" to occupy a street. The "tangible" property employed in the exercise of this right is merely incidental to the right. Prior to the enactment of chapter 712 of the Laws of 1899 the property thereby rendered assessable had never been assessed locally and, therefore, the local assessors are deprived of no function. (*Matter of N. Y., W. S. & B. R. R. Co.,* 37 Hun, 317; *Ritchmyer v. Morss,* 3 Keyes, 349; *Matter of McPherson,* 104 N. Y. 306; *Matter of Romaine,* 127 N. Y. 80; *People v. H. Ins. Co.,* 92 N. Y. 328; *H. Ins. Co. v. New York,* 134 U. S. 594.) The franchises granted by the municipal authorities to the relators herein to use public streets are property. (*People v. O'Brien,* 111 N. Y. 1; *People v. Deehan,* 153 N. Y. 528; *Ingersoll v. N. E. R. R. Co.,* 157 N. Y. 453.) The grant of property by the state or by a municipal corporation, upon payment therefor of a consideration, payable either in gross or by annual payments, and expressed in the grant, does not carry with it any implied condition or agreement that the property so granted shall be forever thereafter exempted from taxation. Taxation of the property so granted is not an impairment or change of the contract by which the grant was made. (*People ex rel. v. Board of Commissioners,* 76 N. Y. 64; *People v. Commissioner of Taxes,* 82 N. Y. 459; *People ex rel. v. Davenport,* 91 N. Y. 574; *Delaware Railroad Tax,* 18 Wall. 206; *M. G. L. Co. v. Shelby County,* 109 U. S. 398; *N. O., C. & L. R. R. Co. v. New Orleans,* 143 U. S. 192; *Ford v. D. & P. L. Co.,* 164 U. S. 662.) A law which imposes a tax upon property for public use and in which provision is made for notice to the person taxed, a hearing before the assessing officers, and an opportunity for review by the courts does not take property without due process of law. (*Kentucky R. R. Tax Cases,* 115 U. S. 321; *McMillen v. Anderson,* 95 U. S. 37; *Lent v. Tillson,* 140 U. S. 316; *Palmer v. McMahon,* 133 U. S. 660;

*Paulsen* v. *Portland,* 149 U. S. 30 ; *Stuart* v. *Palmer,* 74 N. Y. 183.)   It is possible to ascertain the value of a special franchise with substantial correctness and the act is not void from impracticability. (*People* v. *Davenport,* 91 N. Y. 574 ; *People* v. *Feitner,* 54 App. Div. 217 ; *People* v. *Coleman,* 107 N. Y. 541 ; *People ex rel.* v. *Barker,* 144 N. Y. 94 ; *People ex rel.* v. *Barker,* 146 N. Y. 304 ; *C. S. Ry. Co.* v. *Common Council,* 125 Mich. 673 ; *A. E. Co.* v. *State Auditor,* 166 U. S. 185.)   The assessments are not illegal, because several special franchises belonging to the same corporation, and all in the same tax district, were assessed as a unit and not separately. (*People ex rel.* v. *Feitner,* 65 App. Div. 318 ; 169 N. Y. 604 ; *C. S. R. R. Co.* v. *Common Council,* 125 Mich. 683.)

*David B. Hill* for respondents.   The function of assessment for the purposes of taxation is inherently a local function and adheres to the counties, cities, towns and villages of the state with substantially the like effect as though there was an express provision therefor in the Constitution, and such function cannot be transferred to officials not elected or appointed by such localities. (*People* v. *Raymond,* 37 N. Y. 428 ; *Matter of Brenner,* 170 N. Y. 185 ; *People* v. *Albertson,* 55 N. Y. 50 ; *Rathbone* v. *Wirth,* 150 N. Y. 459 ; *People ex rel.* v. *McKinney,* 52 N. Y. 374 ; *People ex rel.* v. *Crooks,* 53 N. Y. 648 ; *People ex rel.* v. *Foley,* 148 N. Y. 677 ; *People ex rel.* v. *Randall,* 151 N. Y. 497 ; *People ex rel.* v. *Palmer,* 154 N. Y. 133.)

*Charles F. Brown, David B. Hill, Frank H. Platt* and *William H. Page, Jr.,* for Metropolitan Street Railway Company, respondent.   The effect of the Special Franchise Tax Law is to transfer to the office of state tax commissioners the function of assessing a large class of property for local purposes, which, at the adoption of the Constitution, was a function of the office of city, town or village assessors. This the legislature had no power to do. (*People* v. *Raymond,*

37 N. Y. 428; *People ex rel.* v. *McKinney,* 52 N. Y. 374; *People* v. *Albertson,* 55 N. Y. 50; *Matter of Brenner,* 170 N. Y. 185; *Matter of Allison* v. *Welde,* 172 N. Y. 421; *People* v. *Draper,* 15 N. Y. 532.) The assessment of property has always been the function of a local officer. (1 Dowell's Hist. of Taxation, 70, 74; 1 Stubbs' Const. Hist. of England [3d ed.], chs. 12, 14, 15; Howard's Local Const. Hist. of U. S. ch. 4, subd. 6; *People* v. *Harding,* 53 Mich. 481; *People* v. *Hurlburt,* 24 Mich. 44; *Slaughter House Cases,* 16 Wall. 36.) The assessment of property for the purposes of taxation is a function of local officers, who are required to be selected as provided by section 2 of article 10 of the Constitution. (*People* v. *Raymond,* 37 N. Y. 428; *Warner* v. *People,* 2 Den. 272; *People* v. *Albertson,* 55 N. Y. 50; *People* v. *Priest,* 169 N. Y. 432.) The Special Franchise Tax Law cannot be sustained upon the fact that a franchise to use streets, highways and public places was not at the adoption of the Constitution subject to direct taxation, or upon the theory that the relation between the franchise and the tangible property in connection therewith is such that the legislature is justified in withdrawing the latter from the jurisdiction of local assessors and requiring both classes of property to be assessed together by state officials. (L. 1900, ch. 254, § 42; *People* v. *Albertson,* 55 N. Y. 50.) The Special Franchise Tax Law cannot be sustained upon the grounds that the amount of property withdrawn from the jurisdiction of local assessors is so inconsiderable that the home rule principle of the Constitution is not violated. (*McCulloch* v. *Maryland,* 4 Wheat. 316; *Met. Bd. of Excise* v. *Barrie,* 34 N. Y. 657.) The contention that it is within the power of the legislature to take to itself and resume the appointment and control of offices for the purpose of performing administrative duties throughout the whole state, even though such administrative duties were at the adoption of the Constitution performed by local officers in the cities, towns and villages of the state for local purposes, cannot be sustained. (Dillon on Mun. Corp. [4th ed.] § 12;

1903.] People ex rel. Met. St. Ry. Co. v. Tax Comrs. 425

N. Y. Rep.] Points of counsel.

*Rathbone* v. *Wirth*, 150 N. Y. 459 ; *People* v. *Hurlburt*, 24 Mich. 44 ; *People* v. *Acton*, 48 Barb. 524 ; *Devoy* v. *Mayor*, etc., 36 N. Y. 449 ; *People* v. *Pinckney*, 32 N. Y. 377 ; *People ex rel.* v. *Common Council*, 28 Mich. 228 ; *Atty.-General* v. *Bd. of Councilmen*, 58 Mich. 213 ; *City of Evansville* v. *State*, 118 Ind. 427 ; *State ex rel.* v. *Deemy*, 118 Ind. 382 ; *People* v. *Shepherd*, 36 N. Y. 285.) The board of tax commissioners erred in assessing all the special franchises of the relator as a single franchise instead of " fixing and determining the value of each " as required by section 42 of the Tax Law. (*May* v. *Traphagen*, 139 N. Y. 478.) The contention that the relator is the owner of several special franchises and that each is a separate piece of property is sustained by consideration of the legal character of the property and by the provisions of law applicable thereto. (*May* v. *Traphagen*, 139 N. Y. 478 ; *People ex rel.* v. *Dolan*, 126 N. Y. 166 ; *People ex rel.* v. *Clapp*, 152 N. Y. 490 ; *People ex rel.* v. *Barker*, 48 App. Div. 248 ; *Williams* v. *N. Y. C. R. R. Co.*, 16 N. Y. 97 ; *Craig* v. *R. C. & B. R. R. Co.*, 39 N. Y. 404 ; *People* v. *Kerr*, 27 N. Y. 188 ; *Milhau* v. *Sharp*, 27 N. Y. 611 ; *People* v. *Cassidy*, 46 N. Y. 46 ; *People* v. *O'Brien*, 111 N. Y. 1.)

*William H. Page, Jr.*, for Twenty-third Street Railroad Company et al., respondents. The legislature of this state cannot appoint or authorize central authorities to appoint any local officer, nor can the legislature create state officers to perform an inherently local function of government. (*Sheboygan* v. *Parker*, 3 Wall. 93 ; *Matter of Mayor*, etc., 99 N. Y. 569 ; *People ex rel.* v. *State Bd. of Canvassers*, 129 N. Y. 360 ; *Rathbone* v. *Wirth*, 150 N. Y. 459 ; *People* v. *Mosher*, 163 N. Y. 32 ; *People* v. *Bull*, 46 N. Y. 57 ; *People* v. *McKinney*, 52 N. Y. 374 ; *People* v. *Crooks*, 53 N. Y. 648 ; *People* v. *Foley*, 148 N. Y. 677 ; *People* v. *Acton*, 48 Barb. 524 ; *Matter of Brenner*, 170 N. Y. 185.) The function of assessing property — of perfecting a valuation of property as a basis of taxation — is to be exercised exclusively by local

426 People ex rel. Met. St. Ry. Co. *v.* Tax Comrs. [April,

Points of counsel. [Vol. 174.

officers; and, therefore, the officers who exercise that function in New York city must be " city officers " within the meaning of the " home rule" provision of the State Constitution. (*People* v. *Raymond*, 37 N. Y. 428.) The effect of the Special Franchise Tax Act is to deprive the local assessor of the function of assessing taxable property, and is, therefore, unconstitutional. (*People ex rel.* v. *Priest*, 169 N. Y. 432 ; *People* v. *Hastings*, 29 Cal. 449.) The history of the assessment of taxable property in New York state shows conclusively that the function of assessment has always been regarded as a purely local function, and it is impossible to suppose that the people intended to confer upon the legislature the power to interfere with this immemorial custom. (1 Colonial Laws, 14, 61, 131 ; 2 Colonial Laws, 269 ; 3 Colonial Laws, 577 ; 4 Colonial Laws, 419 ; 5 Colonial Laws, 858 ; *Goodell* v. *Jackson*, 20 Johns. 693 ; *Matter of Allison* v. *Welde*, 172 N. Y. 421 ; *People ex rel.* v. *Potter*, 47 N. Y. 375 ; *Pope* v. *Phifer*, 3 Heisk. 682.) This court has upheld the right of the legislature to interfere with local administration of certain state police powers. (*People ex rel.* v. *Draper*, 15 N. Y. 532 ; *Metro. Bd. of Excise* v. *Barrie*, 34 N. Y. 657.) But the assessment of property as a basis of taxation has always been as a matter of fact, and has been held to be as a matter of law, exclusively a local function of government. (*People* v. *Raymond*, 37 N. Y. 428.) Special franchises must be valued by a local officer, because the Special Franchise Tax Act provides for the imposition of a property tax, and not a license fee. (*Matter of Swift*, 137 N. Y. 77.) The contention that the so-called " special franchise " constitutes a new species of property, with the characteristic distinguishing features that it is partly intangible and not localized does not warrant its assessment by a state official. (*City of Buffalo* v. *Le Couteulx*, 15 N. Y. 451 ; *M. S. Bank* v. *City of Rochester*, 37 N. Y. 365 ; Cooley's Const. Lim. [6th ed.] 220.)

*Frank H. Platt* for Consolidated Gas Company of New York, respondent. The Special Franchise Tax Law taxes

only the rights of a company to use streets, and its tangible structures in the streets used in connection with those rights. The tax is laid on no other property or right. The valuation must be of the special franchise, separate from all other rights and property. (*People ex rel. v. Dolan*, 126 N. Y. 166.) The considerations which influenced the commissioners in making their assessment of the company's special franchises afforded no true test of the value of those special franchises, and resulted in no actual valuation thereof. The assessment was a mere arbitrary determination. (*People ex rel. v. Ganley*, 29 N. Y. S. R. 135; *City of Syracuse v. Stacy*, 45 App. Div. 249; *People ex rel. v. Barker*, 146 N. Y. 304; *People ex rel. v. Coleman*, 126 N. Y. 433; *State R. R. Tax Cases*, 92 U. S. 575; *C., C., C. & St. L. R. R. Co. v. Backus*, 154 U. S. 439; *A. E. Co. v. Ohio State Auditor*, 165 U. S. 194; *People ex rel. v. Barker*, 139 N. Y. 55; 141 N. Y. 251; *People ex rel. v. Barker*, 165 N. Y. 305.) The valuation of property according to some proper principle of valuation is essential to the validity of an assessment, and, as the valuation of the state board was a mere arbitrary determination, the assessment should be set aside. (*Lee v. Parry*, 4 Den. 125; *Doughty v. Hope*, 3 Den. 594; *Powell v. Tuttle*, 3 N. Y. 396; *People v. Supervisors*, 11 N. Y. 563; *Middletown v. Berlin*, 18 Conn. 189; *Cooley on Taxation*, 353, 354; *Woodman v. Auditor-General*, 52 Mich. 28; *Greenough v. Fulton Coal Co.*, 74 Penn. St. 486; *People v. Hastings*, 29 Cal. 449; *People ex rel. v. Coleman*, 126 N. Y. 433; *People v. Weaver*, 100 U. S. 539.) The company is aggrieved by the assessment, and has shown itself entitled to relief. (*People ex rel. v. Barker*, 148 N. Y. 70; *People ex rel. v. Coleman*, 126 N. Y. 433; *People ex rel. v. Barker*, 146 N. Y. 304; 152 N. Y. 417; *People ex rel. v. Dederick*, 161 N. Y. 195; *People ex rel. v. Barker*, 139 N. Y. 55.) There is no method by which the value of a special franchise can be ascertained. (*People ex rel. v. Dolan*, 126 N. Y. 166; *People ex rel. v. Clapp*, 152 N. Y. 490; *People v. Kerr*, 27 N. Y. 188; *Kellinger v. F. S. S. Ry. Co.*, 50 N. Y. 206; *Zolli-*

428   People ex rel. Met. St. Ry. Co. *v.* Tax Comrs.   [April,

Points of counsel.   [Vol. 174.

*koffer* v. *Havemeyer*, 2 Hun, 300; *Matter of Adams*, 141 N. Y. 297; *Matter of B., H. T. & W. R. Co.*, 22 Hun, 176; *People ex rel.* v. *Comrs.*, 104 N. Y. 240; *State R. R. Tax Cases*, 92 U. S. 575; *C., etc., R. R. Co.* v. *Backus*, 154 U. S. 439.) As there is no method of ascertaining the values of special franchises, the Franchise Tax Act is impossible of execution. (*People ex rel.* v. *Morgan*, 168 N. Y. 1; *Hughes' Case*, 1 Bland, 46; *Ward* v. *Ward*, 37 Tex. 389; *Chaffee's Appeal*, 56 Mich. 244; *Drake* v. *Drake*, 4 Dev. 110.) The assessment of the special franchises of the company should be set aside, because the board undertook to assess all of its special franchises as one franchise instead of assessing each franchise separately. (*E. E. Co.* v. *N. H. E. L. Co.*, 35 Fed. Rep. 233.)

*Charles A. Collin, William F. Sheehan, John L. Wells, Thomas L. Hughes, Charles H. Werner* and *Charles V. Nellany* for the Brooklyn City Railroad Company, respondent. There is a clear distinction between a corporate charter, constituting the contract of incorporation, which is legislative in its character and subject to legislative alteration, amendment or repeal, and legislation constituting a business contract with a private corporation which is essentially contractual in character, and is not subject to legislative alteration, amendment or repeal, without the consent of the private corporation, party to the contract. (*Langdon* v. *Mayor, etc.*, 93 N. Y. 129; *People* v. *O'Brien*, 111 N. Y. 1.) Such franchise contracts as form part of the special franchises of these respondent corporations (whether such franchise contracts are constituted directly by state legislation accepted by the corporations, or by municipal ordinance, authorized by the legislature and in like manner accepted by the corporations) are business contracts, protected by the Federal Constitution from impairment by legislative alteration, amendment or repeal, without consent of the corporations. (*City of Walla Walla* v. *W. W. W. W. Co.*, 172 U. S. 1.) The taxing power cannot be invoked by the state, to raise itself above the position of a private person, as regards the sacred

observance of its business contracts. (*Murray* v. *City of Charleston*, 96 U. S. 432; *Hartman* v. *Greenhow*, 102 U. S. 672.) In the absence of provisions in the franchise contract itself, reserving the right of the state or municipality to alter, amend or repeal the contract, neither the state nor the municipality can, without the consent of the grantee in the franchise contract, either by state or municipal legislation, or by state constitutional amendment, change the terms of the franchise contract so as to avoid an express stipulation therein on the part of the municipality. (*City of Walla Walla* v. *W. W. W. W. Co.*, 172 U. S. 1; *V. W. Works Co.* v. *Vicksburgh*, 185 U. S. 65; *L. F. El. & W. Co.* v. *City of Little Falls*, 102 Fed. Rep. 663; *N. O. G. L. Co.* v. *L. L., etc., Co.*, 115 U. S. 650; *N. O. W. W. Co.* v. *Rivers*, 115 U. S. 674; *L. G. Co.* v. *C. G. L. Co.*, 115 U. S. 674; *S. T. W. W. Co.* v. *N. O. W. W. Co.*, 120 U. S. 64.; *Am. W. W. Co.* v. *H. W. Co.*, 115 Fed. Rep. 171; *C. Ry. Co.* v. *C. S. Ry. Co.*, 166 U. S. 557; *B. C. R. R. Co.* v. *B. C. R. R. Co.*, 32 Barb. 358.) The taxation of the franchise contracts of public service corporations where the right to impose such tax is not expressly or impliedly reserved in the franchise contracts would be an impairment of the obligation of the contracts, and would, therefore, be unauthorized and void. (*Mayor, etc.*, v. *S. A. R. R. Co.*, 32 N. Y. 261; 34 Barb. 41; *Mayor, etc.*, v. *T. A. R. R. Co.*, 33 N. Y. 42; *Stein* v. *Mayor, etc.*, 49 Ala. 362; *Los Angeles* v. *L. A. W. Co.*, 61 Cal. 65; *Los Angeles* v. *L. A. W. Co.*, 177 U. S. 588; *S. T. Co.* v. *City of Medford*, 115 Fed. Rep. 202; *Gordon* v. *Appeal Tax Court*, 3 How. [U. S.] 133.) The failure of the Special Franchise Tax Law to indicate any principle or method for ascertaining the value of the intangible property included in the special franchise, the failure of the state board to attempt any separate valuation of the intangible property and its failure to adopt or proceed upon any principle or method of valuing the totality of intangible and tangible property together constituting the special franchise, and necessarily the substitution

therefor of speculation and guesswork in place of judgment in making such valuation amounted to such an absence of quasi-judicial action as to constitute the taking of property without due process of law ; and if the statute contemplates such a procedure, the statute itself is unconstitutional for the same reason. (*People ex rel.* v. *Barker*, 48 App. Div. 248; 152 N. Y. 417; *People ex rel.* v. *Clapp*, 152 N. Y. 490; *People ex rel.* v. *Adams*, 125 N. Y. 471; *People ex rel.* v. *Coleman*, 126 N. Y. 433; *Marsh* v. *Bd. of Suprs. of Clark Co.*, 42 Wis. 502; *Goff* v. *Bd. of Suprs.*, 43 Wis. 55; *People* v. *Weaver*, 100 U. S. 539; *Woodbridge* v. *Detroit*, 8 Mich. 274; *People* v. *S. F. S. Union*, 31 Cal. 132.) The state board failed to give the respondent corporations such a hearing as due process of law requires. (*Hager* v. *Reclamation Dist.*, 111 U. S. 701.)

*William N. Dykman* for Coney Island and Brooklyn Railroad Company, respondent. The special franchise on Ocean avenue and Fort Hamilton avenue, formerly owned by Prospect Park and Flatbush Railroad Company, should be separately assessed from the special franchise extending from Prospect Park to Fulton Ferry. (*People* v. *O'Brien*, 111 N. Y. 1.) The commissioners have adopted an erroneous method of assessment. (*People ex rel.* v. *Barker*, 152 N. Y. 417.)

*John C. Tomlinson* and *Edgar J. Kohler* for the New Amsterdam Gas Company, respondent. Things or rights may be property in a legal sense and may have value, and yet that value not be ascertainable in dollars and cents, or capable of admeasurement for the purpose of ad valorem taxation. (*Perry* v. *City of Big Rapids*, 67 Mich. 146; *Dart* v. *Woodhouse*, 40 Mich. 399; *Tax Comrs.* v. *Holiday*, 150 Ind. 216; *People ex rel.* v. *Clapp*, 152 N. Y. 490; *People ex rel.* v. *Neff*, 19 App. Div. 585; *H. B. Co.* v. *Kentucky*, 166 U. S. 150.) A special franchise considered as a distinct piece of property, is in no proper or legal sense capable of valuation, and an assessment thereof cannot be sustained upon the ground

1903.] People ex rel. Met. St. Ry. Co. v. Tax Comrs. 431

N. Y. Rep.]        Opinion of the Court, per Vann, J.

that a special franchise, while not susceptible of an accurate admeasurement of value, nevertheless admits of a sufficiently close approach to a correct valuation to suffice for purposes of taxation. (*Taylor* v. *L. & N. R. R. Co.*, 86 Fed. Rep. 350.)

Vann, J. These appeals were argued together and the questions of law presented are common to all the proceedings. The only questions peculiar to any case were questions of fact, which have been finally disposed of by the concurrent action of the courts below, as they united in adopting the facts as found by the referee. The main discussion at our bar, as well as in the four opinions written in the Appellate Division, related to the question whether the statute under which the assessments were made violates that part of the Constitution which provides for home rule in certain political divisions of the state. In order to answer this question it will be useful to inquire: (1) What does the Constitution prohibit; (2) what does the statute command, and (3) what have the courts held as to the validity of other statutes relating to similar subjects?

The principle of home rule, or the right of self-government as to local affairs, existed before we had a constitution. Even prior to Magna Charta some cities, boroughs and towns had various customs and liberties which had been granted by the crown or had subsisted through long user, and among them was the right to elect certain local officers from their own citizens and, with some restrictions, to manage their own purely local affairs. These customs and liberties, with other rights, had been so often trampled upon by the king as to arouse deep hatred of centralization of power, and we find among the many grants of the Great Charter that "the city of London shall have all its ancient liberties and its free customs as well by land as by water. Furthermore, we will and grant that all other cities and burghs and towns  *  *  *  shall have all their liberties and free customs." (Cap. 13.) "All evil customs  *  *  *  shall immediately be enquired into by twelve knights of the same county, upon oath, who

shall be elected by good men of the same county," and after inquisition made "they shall be altogether destroyed by them, never to be restored, provided this be notified to us before it is done." (Cap. 48.) After this marvelous statute, rights, which before had rested largely on custom, rested on law, with a guaranty against violation by the amazing covenant of King John that if he refused redress for an "excess committed" his subjects should be released from their allegiance and at liberty to make war upon him, "saving harmless our person and the persons of our Queen and children and when it hath been redressed they shall obey us as they have done before." (Cap. 61.)

The rights thus secured after a long struggle and by great pressure, although at times denied and violated by the ruling monarch, were never lost, but were brought over by the colonists the same as they brought the right to breathe, and they would have parted with the one as soon as the other. The liberties and customs of localities reappear on a novel and wider basis in the town meetings of New England and the various colonies, including the colony of New York. The right of the inhabitants of townships and manors to meet at stated times in public town meetings, elect town officers and transact town business, was well established while we were a colony and was recognized by different statutes enacted by the governor, council and general assembly. (Van Schaack, chaps. 1201, 1224, 1419, 1448, 1454, 1459, 1460, 1499, 1536 and 1562; Livingston & Smith, chaps. 43 and 654.)

The business transacted at the town meeting related to highways, care of the poor, and matters of purely local concern. It was confined to the affairs of a small district and was clearly separated from public matters of interest to the colony at large. The officers elected, generally by *viva voce* vote, were supervisors, assessors, collectors, constables, commissioners of highways and overseers of the poor. The powers and duties of these officers were regulated by statute, but the right to select them resided in the people of the locality and was stubbornly insisted upon as inviolable.

Such was the state of affairs when the first Constitution was adopted. While that instrument organized the state, it granted no rights to the people, but was their own creation, expressing the restraints that they desired to place upon themselves by preserving certain principles and methods of government which they wished to remain unalterable. Thus the Constitution of 1777 recognized local self-government as already existing, and continued and protected it, so that it could not lawfully be departed from without changing the Constitution itself. It provided that "town clerks, supervisors, assessors, constables and collectors and all other officers heretofore eligible by the people, shall always continue to be so eligible." (§ 29.) Sheriffs, coroners, loan officers, county treasurers, clerks of supervisors and justices of the peace were to be appointed. (§§ 26, 29.) Thus our earliest Constitution did not create the right to elect the administrative officers of towns, but continued it as it had existed during the history of the colony while it was under the dominion of the English crown. The only local officers mentioned by name as "eligible by the people" were town officers, and in fact almost all officers of other local divisions were appointed by central authority.

The second Constitution, framed in 1821, continued the right by the general clause, applicable to county, town, city and village officers, that "all officers heretofore elected by the people shall continue to be elected; and all other officers, whose appointment is not provided for by this constitution, and all officers whose offices may be hereafter created by law, shall be elected by the people, or appointed, as may by law be directed." (Art. 4, § 15.) Sheriffs, coroners and some other county officers were for the first time made elective.

The third Constitution, drafted in 1846, continued the principle and expanded the right by the following provision : "All county officers, whose election or appointment is not provided for by this Constitution, shall be elected by the electors of the respective counties or appointed by the boards of supervisors, or other county officers, as the Legislature shall direct. All city, town and village officers, whose election or appointment

28

is not provided for by this Constitution, shall be elected by the electors of such cities, towns and villages, or of some division thereof, or appointed by such authorities thereof, as the Legislature shall designate for that purpose. All other officers, whose election or appointment is not provided for by this Constitution, and all officers whose offices may hereafter be created by law, shall be elected by the people, or appointed, as the Legislature may direct." (Art. 10, § 2.) The same provision was carried forward, *ipsissimis verbis,* into our present Constitution. (Art. 10, § 2.)

These and other commands of the different Constitutions, when read in the light of prior and cotemporaneous history, show that the object of the people in enacting them was to prevent centralization of power in the state and to continue, preserve and expand local self-government.

This was effected through a judicious distribution of the power of selecting public officers, by assigning the choice of local officers to the people of the local divisions, and to the people generally, those belonging to the state at large. The management of the local political business of localities, whether as large as a county or as small as a village, is intrusted to local officers selected by the communities where those officers act and through which their jurisdiction extends. The principle of home rule is preserved by continuing the right of these divisions to select their local officers, with the general functions which have always belonged to the office. Unless the office, by whatever name it is known, is protected, as the courts have uniformly held, the right to choose the officer would be lost, for with his former functions gone he would not be the officer contemplated by the Constitution, even if the name were retained. Unless the office or officer is mentioned *eo nomine* in the Constitution, the name may be changed, or the office abolished, provided the functions, if retained at all, remain in some officer chosen by the locality. Local functions, however, cannot be transferred to a state officer. The legislature has the power to regulate, increase or diminish the duties of the local officer, but it has been stead-

1903.] People ex rel. Met. St. Ry. Co. *v.* Tax Comrs. 435

N. Y. Rep.] Opinion of the Court, per Vann, J.

fastly held that this power is subject to the limitation that no essential or exclusive function belonging to the office can be transferred to an officer appointed by central authority. The office may go, but the function must be exercised locally if exercised at all. While no arbitrary line is drawn to separate the powers of local and state officers, the integrity of the local office is protected, with its original and inherent functions unimpaired. It is interference, whether direct or indirect, with the vital, intrinsic and inseparable functions of the office as thus defined and understood that the Constitution prohibits. (*People ex rel. Wood* v. *Draper*, 15 N. Y. 532; *People* v. *Raymond*, 37 N. Y. 428; *People ex rel. Bolton* v. *Albertson*, 55 N. Y. 50; *Astor* v. *Mayor, etc., of N. Y.*, 62 N. Y. 567; *Matter of The Mayor, etc., of N. Y.*, 99 N. Y. 569; *Matter of Gertum* v. *Bd. Suprs.*, 109 N. Y. 170; *Koch* v. *Mayor, etc., of N. Y.*, 152 N. Y. 72; *People ex rel. Burby* v. *Howland*, 155 N. Y. 270; *People ex rel. Comrs.* v. *Board of Suprs., Oneida Co.*, 170 N. Y. 105; *Matter of Brenner*, 170 N. Y. 185; *Matter of Allison* v. *Welde*, 172 N. Y. 421.)

The statute in question authorizes the assessment or valuation, for the purpose of general taxation, of all special franchises by a state board of tax commissioners appointed by the governor. (L. 1899, ch. 712.) The general franchise of a corporation is its right to live and do business by the exercise of the corporate powers granted by the state. The general franchise of a street railroad company, for instance, is the special privilege conferred by the state upon a certain number of persons known as the corporators to become a street railroad corporation and to construct and operate a street railroad upon certain conditions. Such a franchise, however, gives the corporation no right to do anything in the public highways without special authority from the state, or some municipal officer or body acting under its authority. When a right of way over a public street is granted to such a corporation, with leave to construct and operate a street railroad thereon, the privilege is known as a special franchise, or

the right to do something in the public highway, which, except for the grant, would be a trespass.

The statute, which is an amendment of the General Tax Law, declares, in substance, that the right, authority or permission to construct, maintain or operate some structure, intended for public use, "in, under, above, on or through streets, highways or public places," such as railroads, gas pipes, water mains, poles and wires for electric, telephone and telegraph lines, and the like, is a special franchise. For the purpose of taxation such a franchise is made real estate and is "deemed to include the value of the tangible property of a person, copartnership or corporation situated in, upon, under or above any street, highway, public place or public waters in connection with the special franchise and taxed as a part thereof." (§ 2, clause 3.) This includes nothing but what is in the street, directly or indirectly, and excludes power houses, depots and all structures without the lines of the street. The taxes thus imposed are for general purposes, are collected in the same way, and used for the same objects as other taxes upon the general assessment roll.

Prior to the passage of this act general franchises had been taxed for the benefit of the state under a valuation made by a state officer, with the sanction of the courts. (L. 1896, ch. 908, §§ 182, 190; *People ex rel. W. & H. Co.* v. *Roberts*, 154 N. Y. 101.) Special franchises, however, had never been lawfully assessed either by local or state authority, but were made taxable property by the act before us for the first time in the history of the state. (*People ex rel. Manhattan R. R. Co.* v. *Barker*, 146 N. Y. 304; *People ex rel. Brooklyn City R. R. Co.* v. *Neff*, 19 App. Div. 590; affirmed on opinion of Cullen, J., below in 154 N. Y. 763.) The right to assess special franchises by central authority is challenged as a violation of the principle of home rule embodied in the Constitution and especially the right to assess the tangible property annexed thereto and included therein by the act, because the latter is withdrawn from the jurisdiction of the local assessors by whom it had been theretofore assessed.

Every presumption is in favor of the constitutionality of an act of the legislature and, if the Constitution and the act can be reasonably construed so as to enable the latter to stand, it is the duty of the courts to give them that construction; still, it is none the less their duty to adjudge the statute void if it is in plain conflict with the real intent of the fundamental law, when considered in the light of history and in all its aspects. (*Sweet* v. *City of Syracuse*, 129 N. Y. 316 ; *People ex rel. Sinkler* v. *Terry*, 108 N. Y. 1.)

What was the situation that confronted the legislature when it passed this statute to raise money for the support of government?

The governor had officially announced that " the farmers, the market gardeners, and the mechanics and tradesmen having small holdings, are paying an improper and excessive portion of the general taxes." The legislature wished to distribute this burden in a just and equitable manner, to take part of the load from those who carried more than their share and to relieve the farms from some of the effects of depreciation in value through competition with the cheap and fertile lands of the west. It found property scattered all over the state worth nearly two hundred millions of dollars, which was not taxed at all and had never been taxed. This property consisted wholly of special franchises, or privileges given by the state, mainly to corporations furnishing to the public transportation, water, light and other necessities or conveniences of daily life. It had grown rapidly in extent and value during recent years. Its value rested upon the right to use in some manner the public highways of the state, but it was intangible, and doubtless for this reason had never been brought under the taxing power. The legislature also found certain tangible property, which was subject to taxation, situated in the public streets and used only in connection with and as a part of the intangible property not taxed, and of no substantial value except when so used. It found that the valuation of this new kind of property, intangible, invisible and elusive, but of great value, would be attended with peculiar difficul-

ties, which would require a degree of knowledge and skill not possessed by local assessors, but belonging only to experts who had long and carefully studied the subject of taxation in all its varied aspects. The problem was to place a just and adequate value upon a right capable of valuation, but which was unseen, without form or substance, and, as it were, the mere breath of the legislature. It was a new problem that had never arisen before during the history of the state, and it was to be solved, not to meet local needs, but an exigency of state.

How did the legislature deal with this situation?

It created a new system of taxation, brought within its range a new character of property and assigned the duty of making the valuation to the state board of tax commissioners, composed of tax experts already in office, whose sole duty related to the subject of taxation, in all its phases, throughout the entire state. It made the tax commissioners assessors of this new kind of property known as special franchises, clothed them with power to compel the owners to furnish under oath, in addition to a general report containing many details, such information as they called for; authorized them to call upon the local assessors for all facts that they could furnish and to summon aid from all available sources; required them to give notice to the owner affected and an opportunity to be heard, and provided a remedy for review by the courts of every assessment as soon as it was filed. It commanded that all sums, in the nature of a tax, paid by the owner of a special franchise to a municipality for its exclusive use, should be deducted from the tax imposed for local purposes, and exempted the tangible property situated in public highways, and used in connection with the special franchise, from all other forms of taxation. (§§ 2, 42, 43, 44, 45, 46.) The new kind of property was termed real estate, just as it might have been termed personal property, or neutral property, without changing its nature, which was such as local assessors had never dealt with.

The statute should be considered in the light of the circumstances existing when it was passed, which were extraordinary

and unprecedented. The system thus created had never been known before, and, as its main subject, the act dealt with special franchises, which had never been taxed before. Property unknown as the subject of taxation to the framers of any of our Constitutions was brought into the system, which required new methods of valuation and the exercise of functions which had never belonged to local assessors. The property was *sui generis*, and from its nature could not be valued by local officers. Unless it escaped taxation in the future as it had in the past, it was necessary to commit the power to other officers with new functions, wider experience and greater opportunities for observation, who would be able to grasp the new scheme of taxation as a whole. We should not be misled by the terms " valuation " or " assessment," as the simple exercise of judgment, for no work can be done without that, but should compare the intrinsic nature of the functions exercised by the local assessors for time out of mind with those intrusted to the state tax commissioners, which had never been committed to any board or officer before.

The local assessors dealt with tangible property, which could be seen and was open to the judgment of ordinary men, or with written evidence of debts or contracts the value of which could be easily computed. It was their habit to measure, weigh and count; to learn the market value from current sales ; to pass upon physical and material property which they were accustomed to own, rent or use, and with which they were familiar in their daily life. They saw it, knew it and could judge as to its value. It was before their eyes and they could act upon it directly, without resort to complicated computations.

On the other hand, the valuation of special franchises had never been attempted before, but presented a new field of action and called for the exercise of new and different functions. They could not be seen, handled, measured, weighed or counted. They were specialties and had no market value. There were no sales to guide and no experience from ownership, rental or use to rely upon. The new property is real

estate in name, but not in reality, for it is a mere privilege to do something in public streets and places not permitted to citizens generally. While local in a narrow sense it is unconfined in its real nature, for it depends largely on the earning capacity of a going concern, frequently with several special franchises, but with no means of determining the amount earned by each. The value depends upon so many conditions, existing, frequently, in localities widely separated and upon such a complication of facts and figures that the valuation cannot be safely intrusted to men of common knowledge and experience. What greater calamity in the shape of taxation could threaten the vast interests involved than to intrust this important subject to unskilled and incompetent men, some of them willing it may be not only to protect their own localities at the expense of others, but to oppress corporations and favor individuals? The burden could not be distributed equally for each local board would have its own method and theory. Uniform action would be impossible and conflict and confusion would result. A wider view, a different kind of judgment, a balancing of localities and figures, an adjustment and equalization of burdens and an exercise of functions not local in nature were required to meet the situation. As we said in a recent case: "It is no disparagement of the capacity and intelligence of the average assessor to say that it would present to him a problem incapable of accurate solution and a rule of action in the performance of his official duty impossible in practice." (*People ex rel. D., L. & W. R. R. Co.* v. *Clapp,* 152 N. Y. 490, 495.)

The legislature also brought in as an incidental part of the system some tangible property which had been previously assessed by local authority. No tangible property, however, was affected, except such as was situated in the public highways and was so incidental to and dependent upon the special franchises as to have no substantial value unless used in connection with them. The relation between the intangible right to run cars in the streets and the tangible property in the rails to run the cars on, is so intimate as to be inseparable

in any practicable system of estimating values. Of what value are poles, strung with wires, standing in the street, without a special franchise to use them to carry electricity or send the mysterious message? What are appliances worth, when made for a special purpose, if they cannot be used for that purpose? What are rails and ties worth, when so fastened to the land in a public highway as to be legally a part of it, without a special franchise to place and use them them there as part of a railroad? All the mains and pipes, poles and wires, rails and ties of the relators, when separated from their special franchises, have no value except as firewood or old iron. Their only substantial value is the right to use them in connection with the franchise, and, hence, they are incidental to the franchise. As part of the franchise they are worth something, but severed from it nothing to speak of. Suppose a street railroad company should forfeit its special franchise by a violation of the grant, what would its rails and ties be worth? They would cease to exist as rails and ties, and would become simply so much old material and even the title would vest in the owner of the fee. The expense of grading, placing them in position and paving around them, which is a large part of the original cost, would cease to be an investment and would be property no longer. They are worth virtually nothing except for railroad purposes and a railroad cannot occupy a street without a special franchise. Separate them from the franchise by taking away the street privilege, and they are destroyed. Their only value as rails and ties, as distinguished from so much old wood and iron, is gone. Taking the broad and practical view of the subject, which the legislature had the right to take in creating the new system, they have no assessable value worthy of notice, except through the actual and constant use made of them as incidental to the special franchises. The value of either resides in the union of both and can be practically ascertained only by treating them as a unit. Unless assessed together, both cannot be adequately assessed. A man of judgment, in valuing a wagon and especially in estimating its

earning capacity, does not pass upon the body, wheels, top and tongue separately. We regard the tangible property as an inseparable part of the special franchises mentioned in the statute, constituting with them a new entity, which as a going concern can neither be assessed nor sold to advantage, except as one thing, single and entire. (*People* v. *O'Brien,* 111 N. Y. 1; *Gue* v. *Tide Water Canal Co.,* 24 How. [U. S.] 257; *Hammock* v. *Loan and Trust Co.,* 105 U. S. 77; *Buncombe County Commissioners* v. *Tommey,* 115 U. S. 122.)

The function of assessing a special franchise does not in its nature belong to a county, city, town or village, for it has never been exercised by officers of such localities, but to the state, by which it is now exercised for the first time. It is not exclusively local in character and home rule applies only to functions peculiar to localities. It was unknown to our forefathers who brought over primitive home rule, to the colonists who preserved or to the founders of the state who developed it. It is no part of local self-government as known to history, or to learned judges who have written upon home rule in the past. It did not come within the experience of former times and was not contemplated by the framers of our Constitutions. They kept purely local affairs under local control, but this is not local in intrinsic character, for the power to be exercised is not confined to the limits of one community. While some special franchises are within a single tax district, others extend through several and sometimes into different towns, cities, and villages. The legislature could not make a law for each case, and in bringing the new system into operation it provided by general rule for all cases of the same general character, whether then existing or expected in the future.

Moreover, a special franchise, now confined to one tax district, may by expansion, through merger, consolidation, leasing and the like, extend into other tax districts. Such an enlargement is open to all, has been the experience of many and may be the experience of all. The same corporation may have many special franchises, continuous or separate, yet

1903.] People ex rel. Met. St. Ry. Co. v. Tax Comrs. 443

N. Y. Rep.]       Opinion of the Court, per VANN, J.

they are all practically one, because they all belong to one system, the earning capacity of which may be ascertained, but not that of each special franchise independent of the others. By removing a central franchise, the line is broken and the value of all seriously impaired. The combination of all into a single enterprise gives the highest, if not the only value to each. What would a franchise in a town be worth with no right to enter a city or village? While the strength of the chain is in the links, the value of the links is in the chain. Hence, a franchise is not essentially local in character and may require action, observation and estimate beyond the lines of a single tax district, or the accustomed jurisdiction of local assessors. An examination of the books of the corporation may be necessary in making the valuation, yet they may not be kept in the municipality of the assessors' residence. A highway may be local, but the title thereto is not, for whether a fee or an easement it is held in trust for the people at large, represented by the state, which has control of the streets and of the erections therein. (*People* v. *Kerr*, 27 N. Y. 188.) The franchise is the right to put something in the highway and use it there, and if the right fails, the title to what was thus placed goes with the general title.

The special franchises of a railroad in operation from a city into suburban towns may be properly treated as an aggregation, without a precise *situs*, as one piece of property producing a gross income, as a single subject of valuation, like all the personal property of an individual, from one end of the line to the other, although the amount when ascertained must be apportioned and distributed among the several tax districts affected (§ 42). This can make no difference to the company, for it has only so much to pay in any event, and it shows that the work of valuation is not local, but general in its character, and that it is a matter of central rather than municipal concern. It affects the general public rather than the people of a community. The subject is one that local officers cannot handle, because they cannot consider it as a whole by going without their precincts, but must stop at the boundaries of

their several districts.  They cannot make the distribution among localities interested in the special franchises.  Local assessors still remain local assessors, with every accustomed function intact and unimpaired.  Local self-government is untouched and there is no invasion of local functions.  While special franchises were known when the later constitutions were adopted, they were not then known as taxable property. The office of assessor of special franchises was then unknown. It is not local in nature, but is a new office with new functions adapted to property of a new kind and differing in principle from any ever dealt with by local assessors.  Property created by the legislature and never intrusted by it to the local assessors cannot with propriety be said to have been taken away from them.

The entire taxing power belongs to the legislature and not a dollar can be raised for local or general purposes, to carry on self-government in localities or in the state, or to provide for the public safety, order or health except by its authority. This supreme power should be considered in connection with the home rule provision of the Constitution, and neither should be so construed as to embarrass or cripple the other. Home rule, as understood and practiced in the past, giving to localities the right to govern themselves, but not to hamper the government of the state, should be carefully protected from open attack or indirect invasion.  Shadows, however, should give way to substance, and the right to create a new system of taxation and bring in property of a new character, hitherto untaxed, with some other property incidental thereto and worthlesss without it, cannot, as we think, be denied upon principle and should not be withheld from the legislature unless required by some controlling decision of the court.

While is is difficult to classify all the authorities relating to the subject of home rule, the most of them fall into convenient groups.  At the head of the first class stands the celebrated judgment of Chief Judge Denio in *People ex rel. Wood* v. *Draper* (15 N. Y. 532).  In that case the statute combined four counties into one police district, invested five police

commissioners appointed by the governor, acting as a board with the mayors of two cities in the district, with all the powers previously belonging to certain local officers of said cities respectively. The new board was authorized to appoint and control all the policemen, who were to act in any part of the district, regardless of residence or county lines. The validity of the act was upheld upon the ground that the commissioners thus appointed were not city officers, although it was strongly challenged at the bar and by a vigorous dissenting opinion, as a violation of the home rule provision of the Constitution.

Similar acts creating a new system by erecting a metropolitan fire district, a metropolitan health district, a metropolitan board of excise and a capital police district, each embracing the territory of two or more municipal divisions of the state, were also sustained, although functions formerly belonging to local officers were transferred to state officials. (*People* v. *Pinckney*, 32 N. Y. 377; *Metropolitan Board of Health* v. *Heister*, 37 N. Y. 661; *Metropolitan Board of Excise* v. *Barrie*, 34 N. Y. 657; *People ex rel. McMullen* v. *Shepard*, 36 N. Y. 285.)

An act, however, which established a police district consisting of a city, with a police force already organized, and "three small patches of sparsely settled territory, in all less than a square mile," was held unconstitutional as an obvious attempt to evade the restrictions relating to home rule, because it was designed for the city only, and the outside fragments could have been brought into the city if it was deemed necessary to extend police protection to them. (*People ex rel. Bolton* v. *Albertson*, 55 N. Y. 50.)

All these cases, except the last, involved the right to erect two or more separate and independent municipalities into a new civil division, to authorize officials appointed by the state to perform the duties formerly discharged by local officers and yet leaving the municipalities in full existence and untouched in all other respects.

Acts authorizing state officials to construct public buildings, parks and highways, the expense of which was to be paid

locally, have been uniformly sustained, although the power to make such improvements had been previously vested in the local authorities and it was urged that the transfer of the power was an encroachment upon local self-government. (*People ex rel. McLean* v. *Flagg*, 46 N. Y. 401; *Astor* v. *Mayor, etc., of N. Y.*, 62 N. Y. 567; *People ex rel. Kilmer* v. *McDonald*, 69 N. Y. 362; *People ex rel. Comrs.* v. *Board of Suprs., Oneida Co.*, 170 N. Y. 105.)

To the next group may be assigned statutes which, directly or indirectly, authorized the appointment of local officers by state officials, or the legislature, or extended the terms of local officers already elected, or limited the power of local authorities in the appointment of local officers. Such legislation has been condemned as in manifest violation of home rule. (*Warner* v. *People*, 2 Den. 272; *Devoy* v. *Mayor, etc., of New York*, 36 N. Y. 449; *People* v. *Raymond*, 37 N. Y. 428; *People ex rel. Fowler* v. *Bull*, 46 N. Y. 57; *People ex rel. Williamson* v. *McKinney*, 52 N. Y. 374; *People ex rel. Lord* v. *Crooks*, 53 N. Y. 648; *Rathbone* v. *Wirth*, 150 N. Y. 459; *People ex rel. Balcom* v. *Mosher*, 163 N. Y. 32; *Matter of Brenner*, 170 N. Y. 185.) In *People* v. *Raymond*, which is the chief reliance of the relators, there was an absolute overthrow of the local assessor and the transfer of all his functions to a state officer, which, as the court held, deprived "the people of the city of a right secured to them by the Constitution."

The remaining cases decided in this court are not readily classified, but as the validity of the statutes involved was not disturbed, no analysis thereof is necessary. (*People ex rel. Einsfeld* v. *Murray*, 149 N. Y. 367; *Matter of Allison* v. *Welde*, 172 N. Y. 421; *People ex rel. Taylor* v. *Dunlop*, 66 N. Y. 162; *Matter of the Mayor, etc., of N. Y.*, 99 N. Y. 569; *Matter of McPherson*, 104 N. Y. 306; *Matter of Gertum* v. *Bd. Suprs.*, 109 N. Y. 170; *People ex rel. Kemmler* v. *Durston*, 119 N. Y. 569; *Koch* v. *Mayor, etc., of N. Y.* 152 N. Y. 72.)

When new systems have been created for the management

of the indigent insane, the infliction of the death penalty or the punishment of convicts, formerly confined by sheriffs in county jails, by imprisonment in penitentiaries, no question seems to have been raised or claim made that such legislation interfered with the principle of home rule.  The absence of adjudicated cases relating to these and other subjects which might be mentioned is not without significance.  It is also significant that the revisers of our present Constitution, acting but a few years ago, made no change in the home rule provision, as it indicates that they were satisfied with the subject as it had been expounded by the courts and acted upon by the people.

None of the cases cited had to do with such a peculiar situation and novel conditions as faced the legislature when it passed the act to tax special franchises.  Certain expressions of learned judges, used *arguendo*, in discussing the subject of home rule, are relied upon by counsel as establishing a principle that controls this case.  Principles are not established by what was said, but by what was decided, and what was said is not evidence of what was decided, unless it relates directly to the question presented for decision.  " General expressions," as the great Federal jurist once said, " are to be taken in connection with the cases in which those expressions are used."  (*Cohens* v. *Virginia*, 6 Wheat. 264, 399.)

A more specific review of the authorities is unnecessary, for it is sufficient to state that neither singly nor collectively have they so construed the Constitution as to prevent the legislature, under the circumstances existing when it sought to promote a sound public policy by passing the act in question, from creating a new system of taxation, embracing within it a new character of property including incidental additions, and committing the power of assessment to a state board of experts.

The remaining questions raised by the relators do not require elaborate consideration.  We cannot sustain their position that the taxation of a special franchise impairs the obligation of a contract and thus violates the Federal Constitution. (Art. 1, § 10).  The franchises are grants which

448 People ex rel. Met. St. Ry. Co. *v.* Tax Comrs. [April,

Opinion of the Court, per Vann, J.          [Vol. 174.

usually contain contracts, executed by the municipality, but executory as to the owner. They contain various conditions and stipulations to be observed by the holders of the privilege, such as payment of a license fee, of a gross sum down, of a specific sum each year or a certain percentage of receipts, as a consideration or "in full satisfaction for the use of the streets." There is no provision that the special franchise, or the property created by the grant, shall be exempt from taxation. Such a stipulation would be void, for no municipality has power to withdraw property from the taxing power of the state, or to provide by ordinance or contract that it shall be free for all time from the common burden which property generally has to bear. Taxation is the rule, with every presumption to support it, while exemption is an exception, with every presumption against it.

The condition upon which a franchise is granted is the purchase price of the grant, the payment of which in money, or by an agreement to bear some burden, brought the property into existence, which thereupon became taxable at the will of the legislature, the same as land granted or leased by the state. There is no implied covenant that property sold by the state cannot be taxed by the state, which can even tax its own bonds, given to borrow money for its own use, unless they contain an express stipulation of exemption. The rule of strict construction applies to state grants, and unless there is an express stipulation not to tax, the right is reserved as an attribute of sovereignty. Special franchises were not taxed until by the act of 1899 amending the Tax Law they were added to the other taxable property of the state. This is all that the statute does, so far as the question now under consideration is concerned. No part of the grant is changed, no stipulation altered, no payment increased and nothing exacted from the owner of the franchise that is not exacted from the owners of property generally. No blow is struck at the franchise, as such, for it remains with every right conferred in full force, but, as it is property, it is required to contribute its ratable share, dependent only upon value, toward the support

of government. No burden is placed upon it except such as is borne by the homes of the people and money saved for support in old age.

While all attempts of municipalities to undermine or destroy franchises by changing the terms of the grant have been promptly repressed by the courts, there is no case which holds that a franchise, whether general or special, cannot be taxed the same as other private property. The relators accepted their franchises subject to the right of taxation that applies to all property in the state, and we agree with the learned referee that the special franchise tax takes nothing from the grant, exacts nothing as further compensation for the privilege and impairs no contractual obligation.

The further contention of the relators, that the act is impracticable and incapable of execution; that the special franchises should have been separately assessed; that the state tax commissioners adopted no rule in making the assessments; that the relators did not have a proper hearing at the time provided for review, and that due process of law was not observed in the taxation of their property, after due consideration we overrule, without further expression of reasons than already appears.

In reviewing these cases we have received great aid from the strong and exhaustive opinion of the late Judge EARL, for many years a distinguished member of this court, who, acting as referee, decided them in the first instance, after full and careful consideration of all the questions involved. It was the last judicial work of that ripe lawyer and eminent jurist, and we regard his decision as one of the most able and profound judgments ever pronounced by him during his long and useful career.

The order of the Appellate Division should be reversed and judgment of the Special Term affirmed, in each proceeding, with costs.

PARKER, Ch. J., O'BRIEN, BARTLETT, MARTIN, CULLEN and WERNER, JJ., concur.

Order reversed, etc.